MEYER C. ELLENSTEIN, PLAINTIFF-RESPONDENT, v. HERMAN BODY COMPANY, DEFENDANT-APPELLANT.

Argued January 28, 1957—Decided February 4, 1957.

On appeal from a judgment of the Superior Court, Law Division, where Judge Weintraub delivered the following oral opinion:

"Plaintiff sues to recover the balance payable under a contract in writing between Ellenstein & Cooper, to whose interest plaintiff is entitled as assignee on dissolution, and Unique Art Manufacturing Company, the defendant, now known as the Herman Body Company.

"The contract consists of two letters, a letter signed by Ellenstein, addressed to Berger of Unique Art Manufacturing Company dated October 11, 1950, and a letter of Unique Art Manufacturing Company, Inc., signed by Berger as president, addressed to Ellenstein & Cooper, dated October 26, 1950. Ellenstein's letter describes the subject matter as follows: 'You are engaging our firm as your representative to negotiate on behalf of your firm with the employees of Unique Art Manufacturing Company and for services for a period of two years commencing December 1, 1950, as labor relations consultant.' The letter of Unique Art to Ellenstein & Cooper uses essentially the same language. It reads: 'We are engaging your firm to represent us in our negotiations with our employees and the CIO union and for your services as labor relations consultant for a period of two years commencing with December 1, 1950 at a yearly payment of $10,000 on condition that a contract with the union ensue.' The contract referred to in the letter of the Unique Art Manufacturing Company did come into being; it is Exhibit P-3 dated November 9, 1950.

"The defendant does not deny the making of the contract, does not deny performance by the plaintiff, and suggests the existence of no defense whatever to this action other than that plaintiff was engaged to render services as a member of the Bar and that this court should exercise its equitable powers and judicial superintendence of engagements between attorney and client to determine whether the contract is fair and whether the compensation claimed is a reasonable sum for the services rendered.

██ "I just note in passing a circumstance that Mr. Kessler referred to, namely, that there was a change in the ownership of the company. The theory upon which a court of equity will inquire into the contractual relationship between lawyer and client stems from the existence of a fiduciary relationship between the parties. Equity deems it appropriate that inquiry be made to be sure that there was no over-reaching or abuse of the fiduciary relationship, perhaps even with respect to a large corporation, because there are in-

dividuals as stockholders who realistically stand behind the company. If we get behind the corporate veil we find a rather anomalous situation, namely, that the individuals who urge this challenge are not the ones who were involved in the transaction and hence in effect they are urging that there was unfairness exhibited by the plaintiff toward other individuals.

"Moreover, there was an understanding that the claim of the plaintiff would be taken care of. By that I mean it appears from the testimony that in connection with the sale of the stock there was an examination of the liabilities of the company for the purpose of determining the value of the shares and the item for which plaintiff sues was upon the books and hence affected the purchase price. However, I don't think that I should attempt to dispose of this matter upon the approach that the individuals actually concerned in the making of the contract have not charged overreaching. I will assume for present purposes that a corporation is entitled to the equitable inquiry notwithstanding the mentioned circumstances. Hence I proceed to the question whether this is an action for compensation for legal services or an action for compensation under a contract for non-legal services.

"It should be noted that the contract itself—I refer to the two letters—nowhere explicitly suggests that plaintiff was engaged to render legal services. The engagement is to represent the corporation to negotiate on behalf of the firm with employees of Unique Art Manufacturing Company and for services for a period of two years as labor relations consultant. I emphasize the word consultant and point out that the word lawyer or attorney or the like was not used. There is no doubt that attorneys engaged as attorneys frequently spend a good part of their time in the pursuit of matters which are not, strictly speaking, the practice of law. Every practicing lawyer knows that he has difficulty in his endeavor to have the client understand where the lawyer's function ends and the client's obligation to use sound business judgment begins. It is not at all uncommon when a lawyer is

engaged to furnish legal services in the preparation of a contract in connection with some transaction that he soon finds himself negotiating business · terms. That kind of negotiating is something that a broker could do and usually is expected to do. It is not the practice of law as such.

■■ "It is my belief that the controlling circumstance is whether the attorney was in fact engaged for the purpose of obtaining his legal services. If he was so engaged, then the fact that in the course of the rendition of the services he stepped beyond the strictly legal role to undertake to render services which a non-lawyer could render, would not justify the conclusion that he was engaged other than as a lawyer. On the other hand if he is engaged for the rendition of work which inherently is not the practice of law and his knowledge of law may along the line come into play, the engagement is for non-legal work. I think this is essentially the test which is set forth in *Auerbacher v. Wood*, 142 *N. J. Eq.* 484 (*E. & A.* 1948). In that case the court recognized that a labor relations consultant is a business entrepreneur, separate and distinct from a lawyer.

"The court said at page 485 [of 142 *N. J. Eq.*]:

'Thus, defendant announced his intention to practice the profession of a consultant in industrial relations and personnel management; and where the use of such practitioner's knowledge of the law, whether he be a trained lawyer or layman, is but an incident of the practice of this calling, he is not engaged in the practice of law within the intendment of regulations forbidding that pursuit to those not duly licensed.

What constitutes the practice of law does not lend itself to precise and all-inclusive definition. There is no definitive formula which automatically classifies every case. The field of industrial relations, while it overlaps the law in some areas, like other professions and businesses, is yet in its major aspects and objective separate and distinct from the practice of the law and is not in essence of the domain for reasons of policy assigned to the practitioner of the law. The contentions and problems growing out of the industrial relation and personnel administration involve in the main sociological, economic and public relation factors and administrative policies, procedures and practices wholly unrelated to the practice of law. This has become a specialty due to the intricacies of labor-management relations in a complex society; and the use of the specialist's knowledge of the law as a mere incident of the application of his

skill in and understanding of related scientific principles, policies and technique and his training and experience in administrative procedures, now the subject of college classroom instruction as a technical profession in itself, toward the adjustment of essentially non-legal issues and controversies arising out of the relationship, does not without more, constitute the practice of law. Where the primary service is non-legal, the purely incidental use of legal knowledge does not characterize the transaction as the wrongful practice of law.'

Then follows the sentence which was emphasized by Mr. Bilder but which must be read with what I have just read. That sentence, which I am going to quote, refers to a New York case and reads, 'The line drawn in that case was between the primary and the incidental in pursuits overlapping the law.'

"I think I am as solicitous as anyone for the maintenance of the high regard of the public for the profession of law, but that solicitude does not justify a denial of the right which a man has simply because he happens to be a lawyer. If he in fact was engaged to render services in a non-legal area, I think it would be solicitude to the point of foolishness to deny him his rights merely because he is a member of the Bar.

"More important, perhaps, than the nature of the work furnished, is what the parties to the contract contemplated when the contract was made. Were they contracting for legal services or were they not? Did the defendant select Ellenstein because of the defendant's regard for Ellenstein as a lawyer skilled in labor or other law, or did it select Ellenstein because of its regard for him as a practical man in the handling of labor relation problems apart from any legal aspects? There is no doubt that plaintiff held himself out as a labor relations consultant. The contract refers to him as such in its description of the work which he was expected to do. I find nothing suggestive of the role of lawyer nor can I find that in the work as actually performed there was any significant intrusion of legal aspects, and insofar as Ellenstein may have somewhere along the line kept principles of law in mind, it was purely incidental to the primary work. I must be guided by the testimony which is before me and which is uncontradicted as to the heart and

essence of services he did render. Those services consisted of negotiating a contract and ironing out the ultimate terms, rather than wrestling with legal expressions, or dealing with the question of how to phrase the final understanding already reached.

"Kessler and Kessler were the lawyers for the defendant. It may well be that they are not specialists in labor law; I don't know. But the fact is that Berger directed Ellenstein to keep in touch with Kessler who is a lawyer. The probable inference is that Berger was looking to Kessler for legal advice. At any rate, there is nothing in the case to suggest that Berger was looking to Ellenstein for legal advice. The testimony is to the effect that when the terms of the contract were ironed out Krieger prepared the draft, it went to Kessler & Kessler, and Kessler in the presence of Krieger and Ellenstein dictated changes, and performed the lawyer's role. With respect to the pension agreement, the testimony again is to the effect that Ellenstein did not do anything more than undertake to get the union to agree to changes in the contract; that his office in dealing with the union leaders was not to iron out or fight out matters of legal verbiage in the preparation of a contract or the mechanics for achieving the result, but rather to persuade the representatives of the union to reach the business conclusion that a change should be made, that the pension plan should be dissolved.

"Where the evidence thus indicates that plaintiff held himself out to be a labor consultant within the terms of the *Auerbacher* case, was engaged just for that role and that is the kind of work which he performed, the question remains as to how much weight should be given to the use thereafter of terminology suggestive that plaintiff was engaged as a lawyer. Reference, for example, is made to his statement in the depositions that he was an attorney or functioned as a labor relations lawyer or as a lawyer. I don't think too much of a structure can be built upon what Mr. Bilder calls unwitting statements. While they do have an element

of admission that the services rendered were of a legal nature, they are not so much an admission of fact as they are a characterization, a legal conclusion, and when language is used that way prior to the origin of the phase of the controversy in which that legal characterization becomes important, I feel that such statements cannot rise sufficiently high to override the impact of the testimony as to the work actually contracted to be done and actually done.

"Some other circumstances should be commented upon, I don't think that the fact that Krieger, who was present at the meetings on behalf of the employees, carries any appreciable weight. He, too, might have been acting as a consultant in a non-legal capacity, and the fact that a labor relations consultant who is not a lawyer meets on behalf of management with a lawyer acting for the employees, certainly does not suggest that the non-lawyer labor consultant, thus acting for the employer, becomes involved in the practice of law merely because the other side has chosen to be represented by a lawyer. I think, also, the testimony by the plaintiff that he never discussed legal matters with Mr. Kessler but rather discussed factual matters, that is to say, he presented the proposed terms, does not justify an inference that plaintiff was engaged as a lawyer or to act as a lawyer passing upon the legal aspects. It means nothing more than what he says, namely, he reported to Kessler the course of the business negotiations. What he is really saying is: 'Mr. Kessler and I never sat down to debate the legal problems. There just was no discussion of them. All I reported to him was the progress of the business negotiations.' There was also the dissolution of partnership agreement with its general recital that the partners had engaged in the practice of law. The fact that the account receivable here involved was there included does not constitute contradictory testimony as to what in fact was contracted to be done and was done in this case.

"The ledger sheets of defendant were offered by the plaintiff, I am not sure why, except perhaps to indicate, if anyone lost track of the real issue, that whoever bought the stock know-

ingly acquired the liability to the plaintiff. I suppose that is what counsel had in mind. I don't see any need for proving that the purchaser of the stock interest knew of the corporate liability. At any rate these sheets were offered to show that this item was upon the books. The item is there carried as 'accrued legal expense.' I don't think very much stock can be put in that characterization. I don't know how it came about that the item was entered in a ledger under that title. It may very well be that the accountant or bookkeeper knew Ellenstein & Cooper were lawyers and hence assumed these were legal services. If Berger or an officer of the company fully familiar with the actual transaction thought of the services as legal services and hence directed the entry upon the books of account in the manner that I have indicated, that too would not carry much weight; it would still be only his legal conclusion. We are without testimony by Berger or other officers of the company at the time when the contract was made as to what their understanding really was. Why did they go to Ellenstein? Because he was a lawyer and for legal advice? Or did they go to him because of their understanding that he was a labor consultant and negotiator?

"There is no proof to meet the plaintiff's case. I see no reason why I should not give judgment against the defendant in the full amount claimed plus interest. This makes it unnecessary for me to consider what we have referred to as the second phase, namely, if the contract related to the rendition of legal services, what is the rule in dealing with a retainer agreement? Do we consider the fairness of the contract as of the time when made? Do we become concerned solely with how much service was in fact rendered and the value thereof? That is not before me in the light of the conclusions I have reached. The rights of the parties in that regard are fully reserved for consideration, if the conclusion I have reached on the first phase should be found to be erroneous.

"Judgment will be entered accordingly."

*Mr. Walter J. Bilder* argued the cause for the appellant (*Messrs. Bilder, Bilder & Kaufman,* attorneys).

*Mr. William A. Ancier* argued the cause for the respondent (*Messrs. Rosenthal & Gladstone,* attorneys; *Mr. Samuel I. Kessler,* of counsel).

PER CURIAM. The judgment is affirmed for the reasons expressed in the opinion of Judge Weintraub in the court below.

*For affirmance*—Justices HEHER, OLIPHANT, BURLING and JACOBS—4.

*For reversal*—Chief Justice VANDERBILT—1.