331 So.2d 617 (1976)
Iris L. WILSON
v.
LIBERTY NATIONAL LIFE INSURANCE COMPANY.
Iris L. WILSON
v.
The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES.
SC 1522, SC 1546.
Supreme Court of Alabama.
April 2, 1976.
As Corrected on Denial of Rehearing May 7, 1976.
Chason, Stone, Chason & Partin, Bay Minette, for appellant.
J. B. Blackburn, Bay Minette, for appellee, Liberty Natl. Life Ins. Co.
Johnstone, Adams, May, Howard & Hill and Richard T. Dorman, Mobile, for appellee, The Equitable Life Assurance Society of United States.
BLOODWORTH, Justice.
Iris L. Wilson, the beneficiary under three insurance policies issued on the life of her husband, Charles W. Wilson, filed three lawsuits in the Circuit Court of Baldwin County, against the three insurers. All three suits presented the same basic issue, that is, whether the insured died as a result of accidental causes, thereby entitling *618 Iris Wilson, the beneficiary, to accidental death benefits provided by the policies.
The beneficiary's suit against Colonial Life & Accident Insurance Company was removed to the federal district court, where the District Judge found that the insured's death did not result from accidental causes. Summary judgment was rendered in favor of defendant insurance company in that case.
The Baldwin County circuit court made similar dispositions in the two cases which are on appeal here [Wilson v. The Equitable Life Assurance Society of the United States and [Wilson v. Liberty National Life Insurance Company]. Summary judgments were granted in both cases in favor of the insurers. These two cases were consolidated on this appeal.
The accident, upon which Mrs. Wilson bases her right to recover accidental death benefits, occurred on December 22, 1972, when Mrs. Wilson's husband, the insured, fell down some steps landing on his buttocks. This fall caused the insured considerable back pain and may have caused a lumbar strain, although later X rays revealed no damage. As a result of this fall, the insured was hospitalized from January 1, 1973, until January 19, 1973 "with strain after having fallen down the steps and having concurrent increase in his angina or chest pain."
However, on January 26, 1973, the insured was readmitted to the hospital, this time for congestive heart failure. For at least four years, the insured had been afflicted with "three vessel disease," the most serious coronary disease. This disease is both permanent and progressive and is associated with a very poor life expectancy for its victims. Prior to his fall, the insured's heart condition was deemed to be inoperable. On January 27, 1973, one day after being admitted to the hospital, the insured died. The death certificate indicates that the cause of death was arteriosclerotic heart disease with acute myocardial infarction, but it also lists trauma to the back as an aggravating cause of death.
The two policies under which Mrs. Wilson sought to recover in the circuit court were similarly worded. Both contained a "general clause" to the effect that accidental death benefits would be paid only upon proof that the insured died as a result of
". . . bodily injuries, caused directly and exclusively by external, violent and purely accidental means, . . . directly and independently of all other causes, . . ."
In addition, both policies included an "additional clause" to the effect that no benefit shall be payable
". . . for any loss resulting from or caused directly or indirectly, wholly or partly, by. . . bodily or mental infirmity . . . or disease or illness of any kind, . . ."
In Alabama, policy language similar to that contained in the "general clause" has been construed to mean that "if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity." [Emphasis supplied.] Liberty Nat'l Life Ins. Co. v. Reid, 276 Ala. 25, 33, 158 So.2d 667, 674 (1963).
However, our cases also hold that where the policy contains the "additional clause" then no recovery can be had where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident. First Nat'l Bank v. Equitable Life Assurance Soc. of the United States, 225 Ala. 586, 590-91, 144 So. 451, 455 (1932); Liberty Nat'l Life Ins. Co. v. Reid, supra.
*619 With respect to the "additional clause," our cases also hold, as stated by Bouldin, J., in Equitable, supra:
"But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death.
"The general rules of construing insurance policies favorably to the insured apply to these clauses touching bodily infirmity, etc."
225 Ala. at 589, 144 So. at 454.
Thus, it is that Harwood, J., in Reid, supra, concluded:
"If an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken. Each case must be particularized."
276 Ala. at 33, 158 So.2d at 674. Then, Justice Harwood adds:
"Where the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented."
Id.
Mrs. Wilson, the beneficiary of the policies, contends that her husband's fall and the injuries, pain, and emotional distress that he suffered from the fall placed additional demands upon his heart, directly resulting in his death. Under this theory of recovery, it is contended that the consequences of the insured's accident triggered a dormant heart condition, and precipitated the insured's death.
In furtherance of this contention, Mrs. Wilson argues that the evidence before the trial court presented at least a scintilla of evidence in support of her theory of recovery and that therefore the grant of summary judgment was in error.
The trial court, in considering the motions for summary judgment, had before it: the pleadings; the deposition of Dr. Martin Lester (the insured's personal physician); the insurance policies in question; the death certificate recording the cause of Charles Wilson's death; the findings of fact and conclusions of law of the U.S. District Court in Wilson v. Colonial Life & Accident Insurance Company; and, the affidavits of Iris Wilson in opposition to the motions for summary judgment.
We agree with the beneficiary, Mrs. Wilson, that the sole question presented by these appeals is whether the evidence before the trial court provided a scintilla of evidence in her favor thereby presenting a genuine issue as to a material fact and preventing the summary judgments being rendered against her. Putting the issue another way, are the insurers entitled to summary judgment as a matter of law?
The committee comments following Rule 56, A.R.C.P., quote with approval the following textbook authority:
"The summary judgment procedure is not a substitute for the trial of disputed issues of fact. On a motion for summary judgment, the court cannot try issues of fact. It can only determine whether there are issues to be tried.. . ." 3 Barron & Holtzoff, Federal Practice and Procedure, § 1231 (1958).
The committee added that "if there is a scintilla of evidence supporting the position of the party against whom the motion is made, so that at a trial he would be entitled to go to the jury, summary judgment *620 cannot be granted." Id. [Emphasis supplied.]
Our scintilla rule requires only that the evidence, or reasonable inferences therefrom, furnish a mere gleam, glimmer, spark, the least bit, the smallest trace, in support of the plaintiff's complaint. Union Central Life Ins. Co. v. Scott, 286 Ala. 10, 236 So.2d 328 (1970, per Lawson, J.).
Since we have the scintilla rule in Alabama, and such is not the rule under F.R.C.P., there is a clear distinction between this case and the federal district court case.
The following extracts from the documents submitted on summary judgment indicate to us that the beneficiary has at least raised a scintilla so as to defeat summary judgment. Thus, we do not think the insurer was entitled to summary judgment as a matter of law.
"STATE OF ALABAMA "BALDWIN COUNTY
"Before me, the undersigned authority, in and for said County in said State personally appeared Iris L. Wilson who is known to me and who, after being by me first duly and legally sworn did depose and say as follows:
"My name is Iris L. Wilson and I am one and the same person as the Plaintiff. . . . I am the widow of Charles W. Wilson and the beneficiary of the insurance policies . . . . My husband at the time of his death was an employee of Cosby-Hodges Milling Company with his office and headquarters in Mobile, Alabama, where he was the manager of that branch of his employer. For the six months prior to December 22, 1972, my husband was regularly engaged in performing his duties for his employer which consisted of traveling about his sales territory, fulfilling his duties in the office, and generally performing the normal duties associated with his employment at which he was actively engaged from eight to ten hours per day. . . .
"On December 22, 1972, at about 7:30 p.m., my husband was leaving his office after locking the door to the office he turned, slipped and fell down about six or seven concrete steps to the ground level. . . . I drove my husband to Thomas Hospital. . . . and all the while he was complaining of pain in his head and of hurting all over, but mainly with the pain in his head. We went back home . . . but he couldn't sleep on account of the pain and he got up and walked around all night long. He and I went to Bay Medical Clinic at about 8:30 or 9:00 on the morning of December 23, 1972, where we saw Dr. Yancey who took x-rays of my husband. Dr. Yancey told him `you are just bruised to hell and back'; . . . . Dr. Yancey prescribed some sort of medication.. . . For the remainder of the day of December 23, and all of December 24, 1972, my husband was up and down . . . . Christmas day . . . was the same sort of day and this continued for the rest of the week with my husband trying to `tough it out' so it wouldn't mess up everybody's Christmas.
"On January 1, 1973, . . . . We went to Thomas Hospital . . . . He was placed in the intensive care unit. . . . He stayed in the hospital for about ten days and during that time had no involvement with his heart.
"On January 11, 1973, my husband left Thomas Hospital and went to see Dr. Lester in Mobile who arranged for him to be admitted to Mobile Infirmary before he saw him. . . . My husband stayed in the Mobile Infirmary until January 19, 1972, . . . .
"On January 26, 1973, my husband went to Dr. Lester in Mobile for an appointment and Dr. Lester told him that he needed to go to the hospital. . . . At about 4:30 on the afternoon of the 26th, my husband was admitted in the hospital and placed in a semi-private room. He was still complaining of pain in his head.
*621 "On January 27, 1973, at about 1:00 or 2:00 p.m., my husband died. . . .
". . . at the time that he fell down the steps at his office, he was apparently in good shape, had had no trouble for the last six or seven months and was actively engaged in his employment and his normal activities." [Emphasis supplied.]

"DOCTOR F. MARTIN LESTER,

"DIRECT EXAMINATION
"Q All right. Tell me, please, sir, when was the first time that you saw Mr. Wilson?
"A February the 1st, 1971, is a referral from Dr. Mullins from Fairhope."
* * * * * *
"Q And, you say he was involved in an accident in June of 1970?
"A Right. . . . He was hospitalized on 1-11-73 with lumbar sprain. He was actually transferred from FoleyFairhope hospital. At this time he had a historyof havingnow, this was on 12-22-72, a report was he was doing well. He fell down some steps striking his buttocks. He has been in severe pain. This is the same illness involved eventually into the developmentas far as I can tell into the death situation. . . . Hospitalized by us on 1-11-73 until January the nineteenth, seventy-three, with a strain after having fallen down the steps and having concurrent increase in his angina or chest pain. . . ."
* * * * * *
"Q And, after his stay at hime, there, January 19th, 1973, when did you next see him?
"A We saw him on 1-26 in the office during the morning at which time he was havinghe was tired, he was having a little difficulty breathing, and he had an irregular pulse and was in frank heart failure . . . . We saw him at eight o'clock that night and he developed a lot of symptoms. He had difficultywe noticed him walking the floor and he complained bitterly of back pain, lower back pain, and some difficulty breathing. . . . We moved him to the coronary unit and he died within an hour. . . . So, the manfranklyI saw him on the twenty-sixty, he was a frantic, red faced, exhausted appearing man who had obviously not slept in three to four days. . . ."
* * * * * *
"Q Go ahead and do it now if you would like.
"A Again, there is no direct cause of a fall. There is no possible way the fall would make the arterial sclerosis worse or make him have a heart attack. I want to get that straight. The only thing it was a cause is put this man under pressure and it, the medical treatment, the worry and this type thing added to the overall stress just as exercise would do or anything putting his heart under more strain. I think that is the only way it could conceivably could have causedhave any effect. . . ."

* * * * * *

"CROSS EXAMINATION

"BY MR. STONE:
"Q Now, as I take your testimony, you are saying that really this fall may have started a chain reaction of some sort which ultimately resulted in Mr. Wilson's death, is that correct?
"A It didn't result in it, no. It set off. . ."

* * * * * *
"Q Now, would it be correct to say that it would not have caused his death except for the existence of the heart condition?

*622 "A I wouldn't say it was correct to say it caused his death. It was correct to say that it may have contributed to his overall life existence during that next month or so to the point where it could make him put extra strain on his heart."
* * * * * *
"Q Now, do you know when he fell?
"A I am going to have to give you an approximation.
"Q That's all right. I withdraw it. It's not that important.
"A Actually, he talked about thisdoing quite well until 12-22-72, he had fallen down some steps striking his buttocks on 12-22.
"Q All right. Now, would it be correct to say Mr. Wilson's heart condition was a condition upon which the accident operated?
"A Not directly, no. But, it could indirectly."
* * * * * *
"Q But, it created tension, anxiety and like symptoms in Mr. Wilson which operated on the heart condition?
"A Right.
"Q All right.
"A These caused an increased demand of the heart for oxygen. This tension in his situation would keep his blood pressure up, and all of which had a detrimental effect on known heart disease, which he had."
"Q This accident did start something in movement or momentum, didn't it, Doctor, that ultimately affected his heart?

"A Right. . . ."

* * * * * *
"Q Was that related to the fall?
"A I think that wasthatthat is what set him off this time, yes. That is what got him all going back and forth to the doctor for pain shots and raising sand, and the conflicts he would get into with the people."

* * * * * *

"RE-CROSS EXAMINATION
"BY MR. STONE:
"Q It is just like you told this gentleman it triggered this whole thing, is that correct? I am not trying to put words in your mouth, is that correct?
"A It justit was just another episode that got him up and put his heart under stress, yes."
We think the foregoing demonstrates that the only real question is whether there was a scintilla of evidence (under the "additional" clause) that the injury started a chain reaction resulting in death and whether or not one of the links in the chain, i.e., heart disease, was a "dormant diseases or physical condition without which the chain would be broken." Reid, 276 Ala. at 33, 158 So.2d at 674.
The evidence on this issue appears to us to be conflicting. The insured was well before the accident. He had no heart trouble for six months previously. He was doing a full day's work, engaging in normal activities when the accident occurred. After the accident, his physical condition deteriorated rapidly, culminating in his death. The doctor, a cardiologist, who was treating the insured, said he was "doing quite well until 12-22-72," the date of the accident; that the accident operated "indirectly" upon his heart condition by creating tension and anxiety which kept his blood pressure up, which in turn adversely affected his heart disease by putting an increased load on it; that it "set off" or "triggered this whole thing"; that this "evolved eventually into" his death in that his heart could not take the increased load.
*623 Therefore, we conclude summary judgment was premature. We reverse and remand.
Perhaps, in conclusion, we should add the cautionary statement that nothing we have written in this opinion relating to factual matters should lead the parties to conclude that we have any judgment or opinion as to the ultimate merits of this lawsuit.
REVERSED AND REMANDED.
FAULKNER, JONES, ALMON and EMBRY, JJ., concur.

ON REHEARING
BLOODWORTH, Justice.
Counsel on rehearing contend that we misconstrued the testimony in making the statement in the opinion: "The insured was well before the accident." We think not but we do concede that this statement could be misinterpreted. Therefore, we correct the sentence so that it reads: "The insured appeared to be well before the accident."
Counsel further contend that we erred in considering the wife's statement that her husband "was apparently in good shape." [Emphasis supplied.] Prudential Ins. Co. v. Calvin, 227 Ala. 146, 148 So. 837 (1933), is cited by counsel. In that case, this Court held that it was reversible error to permit the wife of an insured to answer, over objection, this question: "`When your husband left home that morning, Mrs. Calvin, tell these twelve jurors whether he was in good sound health?'" [Emphasis supplied.] That question called for opinion evidence of an expert which the lay witness could not give. We agree.
However, in American National Ins. Co. v. Rains, 215 Ala. 378, 110 So. 606 (1927), this Court held that a son of an insured could testify that the health of the insured at the delivery of the policy "was pretty good," the statement being in effect that it "seemed or appeared" to be good. Moreover, other lay witnesses were permitted to testify that the insured appeared to be healthy. This was deemed not to be the expression of an opinion but a statement of fact open to ordinary observation.
In the case at bar, the testimony was: "he was apparently in good shape." We consider "apparently," in effect, to state he "appeared" to be "in good shape," a statement of fact open to ordinary observation.
OPINION CORRECTED.
APPLICATION FOR REHEARING OVERRULED.
FAULKNER, JONES, ALMON and EMBRY, JJ., concur.