376 So.2d 660 (1979)
Nell WATKINS
v.
ST. PAUL FIRE AND MARINE INSURANCE CO.
78-171.
Supreme Court of Alabama.
September 7, 1979.
Rehearing Denied November 9, 1979.
W. Stephen Graves, of Alton & Leavell, Montgomery, for appellant.
Robert E. Parsons, of McDaniel, Hall, Parsons & Conerly, Birmingham, for appellee.
TORBERT, Chief Justice.
This appeal involves a coverage question growing out of an attorney's errors and omissions liability insurance policy.
John Marcus, a practicing attorney in the State of Alabama, represented appellant, Nell Watkins, in a personal injury action. Mrs. Watkins received a settlement in December 1975 of $100,000. Of this amount, she received $58,500 after deduction of expenses and attorney's fees.
Sometime prior to the settlement, Mrs. Watkins had discussed with Marcus her desire that he invest the settlement proceeds *661 for her. Several investment opportunities were discussed culminating in an agreement dated November 18, 1975. The agreement was executed prior to actual settlement of the case. The agreement provided as follows:
This Agreement made this the 18th day of November, 1975 by and between John H. Marcus, Attorney at Law, Clanton, Alabama, hereinafter referred to as First Party, and Dorothy Nell Watkins, hereinafter referred to as Second Party, WITNESSETH:
WHEREAS, Second Party is desirous of depositing with First Party in trust the sum of Fifty Thousand and no/100 ($50,000.00) Dollars:
WHEREAS, Second Party is desirous of receiving nine (9) percent per annum on said trust deposit, payable as follows: $1,069.44 per month for a period of 72 months;
WHEREAS, First Party is desirous of paying to Second Party nine (9) percent per annum, as stated above, for and in consideration of said deposit;
THEREFORE, for and in consideration of the mutual covenants contained herein, the parties agree as follows:
1) Second Party does hereby acknowledge that she will deposit in trust with First Party the sum of Fifty Thousand and no/100 ($50,000.00) Dollars, and said deposit or money is turned over to First Party for investment purposes, in that Second Party is to receive the sum of nine (9) percent per annum, repayable as follows: $1,069.44 per month for a period of 72 months.
2) For the use and benefit of said trust deposit, First Party does hereby agree to pay to Second Party nine (9) percent per annum, repayable as follows: $1,069.44 per month for a period of 72 months with the first payment being due and payable thirty (30) days after said trust deposit is made.
3) Attached hereto, marked exhibit "A", is a note, which represents the indebtedness of First Party to Second Party under this Agreement.
4) It is agreed and understood that this Agreement shall be binding upon the heirs or assigns of the parties hereto, and further, that this Agreement should be given a liberal interpretation to meet its expressed end and purpose. [Emphasis added.]
A promissory note dated December 12, 1975 was executed by Marcus and named Mrs. Watkins as payee. The note provided that Marcus would pay Mrs. Watkins $50,000.00 at 9% interest in monthly installments of $1,069.44. Mrs. Watkins endorsed the settlement check over to Marcus which he deposited in his trust account. She received a disbursement of $8,500; the $50,000 balance remained in Marcus' trust account.
Marcus loaned the $50,000 to Clanton Concrete, Inc., a concern of which he was a stockholder and officer. In return Marcus received notes made by Clanton Concrete payable to his trust account at the same 9% interest he agreed to pay Mrs. Watkins.
Marcus made three or four payments pursuant to the agreement but defaulted on all subsequent installments. Thereafter, Mrs. Watkins filed suit against Marcus in the Chilton County Circuit Court and obtained a judgment in the amount of $51,300. Appellee St. Paul Fire and Marine Insurance Company (St. Paul), Marcus' insuror, did not appear or defend the action.
Subsequently, Mrs. Watkins brought suit against St. Paul to enforce the prior judgment by collecting under Marcus' professional liability policy. The complaint included a jury demand. St. Paul's motion for summary judgment was granted on the basis that the conduct of Marcus resulting in Mrs. Watkins' loss was not in the performance of professional services in his capacity as a lawyer and that the loss grew out of a relationship that was not that of attorney and client.
When on motion for summary judgment there is a scintilla of evidence supporting the position of the party against whom the motion is made thereby presenting a genuine issue as to a material fact, summary judgment is not proper. Wilson *662 v. Liberty National Life Insurance Co., 331 So.2d 617 (Ala.1976). The scintilla rule only requires that the evidence furnish a mere gleam, glimmer, spark, the least bit, the smallest trace, in support of plaintiff's complaint. Id.
The policy in question provides in pertinent part:
COVERAGE APROFESSIONAL LIABILITY To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services for others in the Insured's capacity as a lawyer and caused by the Insured or any other person for whose acts the Insured is legally liable (the performance of professional services shall be deemed to include the Insured's acts as an administrator, conservator, executor, guardian, trustee or in any similar fiduciary capacity, but only to the extent for which in the usual attorney-client relationship the Insured would be legally responsible as attorney for a fiduciary).. . . [Emphasis added.]
The sole issue, then, is whether there is a scintilla of evidence that Mrs. Watkins' loss arose out of the performance of professional services by Marcus in his capacity as a lawyer.
Mrs. Watkins and Marcus both testified in their depositions as to the capacity in which Marcus acted in respect to investment of the $50,000. Mrs. Watkins testified as follows:
Q. Now, I want you to tell me exactly what you said and what John Marcus said.
A. About the investment?
Q. About the investment or about the use of the $50,000 or anything else that was said?
A. Okay. I had the money and I wanted John tobeing a lawyerto have investmentyou know, I wanted to make money off my money. So, I could quit work. So, we just talked about that and I asked him to find out if he could invest ita good investment for me to get the most money for it. And he said he would.
. . . . .
Q. Well, what was the reason you didn't go to a bank or a savings and loan association?
A. I just trusted John to do it. He had done a lot of little things for me for a long time and I just trusted him to do it.
Q. What other things had he done for you?
A. He helped me in a divorce case once and something to do with my driver's license once and just any little thing that come up. I just used him as my lawyer.
Marcus was deposed twice. In his first deposition he testified:
A. Which, on or around the 1st of November, after we had received oral communications from the various Defendants, that the matter would be settled for this figure
Q. Uh-huh.
A. I, at that time, told her that I would work it out on an investment agreement, we entered into an investment agreement, and I issued to her a promissory note. And in this investment agreement, which is part of the record, it states in there that the monies would be invested by me, and that she would receive a return of 9 percent on her money. And it was my personal obligation to her.
Before, the agreement was executed, I met with her family on three different occasions and went over it carefully.
. . . . .
A. I am just telling you what is in there [the investment agreement]. And that a note would be executed to her. It was my personal obligation to her. That money was borrowed, and that I would invest the money. And there was nothing in the agreement stating where the money would be invested. It was stated in the agreement that she would receive 9 percent interest, $1,069.42 a month.
. . . . .
Q. Okay. And would it be fair to say that at that time, the attorney-client relationship *663 ended and you had a new relationship of borrower-lender?
A. That's correct. For investment purposes.
Q. And like you said, you had in a sense the power and authority to invest as investment personnel for her without limitation or restriction?
A. That's right. That is shown by the agreement.
However, in his second deposition, he testified:
Q. So, she got sixty thousand and of the sixty thousand, it was decided that fifty thousand would be subject to this agreement?
A. It was decided before the case was actually settled. I had a continuing legal relationship with her. The settlement took place on December 12th, 1975. She came to me before the settlement.
Q. And what happened before the settlement?
A. She asked me to continue to represent her as an attorney with her money that she received and this agreement was entered into on November 18th.
. . . . .
Q. All right, Now what did you tell Mrs. Watkins with regard to what was going to be done with the fifty thousand dollars?
A. She wanted to invest the money and I told her at that time that I would act as a fiduciary, as her attorney. This was for investment purposes and that is basically the arrangement that was made. Again, I explained to her that I had a policy of insurance that as long as I was operating in a fiduciary capacity as an attorney-at-law, that she would be covered in the event of any loss in that result.
. . . . .
Q. Well, at one point in time, did the relationship between you and Nell Watkins become one of borrower-lender?
A. No, sir.
Thus, there is evidence that the parties viewed their relationship as one of attorney and client. Furthermore, it was clearly established that there did exist an attorney-client relationship at one time. In fact, Marcus had performed legal services for Mrs. Watkins on several occasions in the past. Moreover, the relationship existed at the time the investment agreement was prepared, and it existed when the settlement proceeds were receivedproceeds which were obtained for Mrs. Watkins by Marcus in his capacity as a lawyer. And upon obtaining the settlement, she endorsed the check over to Marcus who deposited it in his trust account where the proceeds remained until the disbursements to Clanton Concrete.
We find that the evidence furnishes a mere gleam, glimmer, or spark in support of the existence of an attorney-client relationship. Therefore, it was for the jury to determine whether by execution of the investment agreement and promissory note, the relationship changed from attorney-client into some other relationship by which coverage would not lie under the terms of the policy.
Since there does exist a genuine issue as to a material fact, summary judgment should not have been rendered. Accordingly, this case is reversed and remanded.
REVERSED AND REMANDED.
BLOODWORTH, MADDOX, FAULKNER, ALMON, SHORES and BEATTY, JJ., concur.
JONES, J., with whom EMBRY, J., concurs, dissents.
JONES, Justice (dissenting):
The majority opinion poses the issue thusly: "[W]hether there is a scintilla of evidence that Mrs. Watkins' loss arose out of the performance of professional services by Marcus in his capacity as a lawyer." Except for its emphasis on the scintilla rule, the issue presented is correctly stated. (The application of the scintilla rule is misplaced here because the undisputed facts do not lend themselves to alternative inferences from which more than one factual conclusion *664 could be drawn.[1] The "genuine issue of material fact" element is missing.) By clear, unambiguous language, the terms of the errors and omissions policy restricts St. Paul's liability coverage to "the performance of professional services . . . in the Insured's capacity as a lawyer."
It is not an overly simplistic restatement of the issue to ask: Under these undisputed facts, did Ms. Watkins' loss result from Marcus's misconduct arising out of a lawyer/client relationship? Or, did Marcus default on a personal obligation? Answering the former question "yes," by its application of the scintilla rule in a summary judgment context, the majority holds that the fact finder could infer from the undisputed evidence that, because the lawyer/client relationship existed at the time of the damage claim settlement, Ms. Watkins' subsequent loss arose out of Marcus's professional services in his capacity as a lawyer.
It is faulty reasoning, it seems to me, to say that, because Ms. Watkins' acquaintance with Marcus, her trust in him, and her decision, ultimately, to lend him money, all have their origin in the lawyer/client relationship formerly existing between them, then Marcus's default on the promissory note can be construed as professional misconduct committed in his capacity as a lawyer.
Indeed, Marcus took advantage of his client's personal trust in him in borrowing her money for his personal use. But this stretches the "but for" rule to impermissible limits. "[D]amages arising out of personal services . . . in the Insured's capacity as a lawyer" is a legitimate restriction of coverage; and these facts lend themselves to but one legal conclusion: Marcus received a personal loan from Ms. Watkins. He was acting personally and individually in borrowing the money and in defaulting in his obligation for repayment.
In my view, the fundamental error of the majority opinion lies in its reliance on Marcus's testimony in his second deposition as creating a scintilla of evidence on the lawyer/client relationship issue. Marcus's altered testimony to the effect that he had malpractice insurance coverage to protect Ms. Watkins in the event of his breach of trust and that the relationship did not become one of "borrower-lender" does not constitute evidence of fact, but merely unwarranted conclusions of law. Marcus could not testify, by way of conclusion, to this relationship arising out of undisputed facts. The legal conclusion to be drawn from these facts is a question of law for the court. The facts out of which his liability arose constitute a lawyer/client relationship as a matter of law or they do not. There is nothing to submit to a jury on this factual issue. This is not to say, of course, that, under other circumstances, questions of fact as to the nature of such relationship may not arise; but, here, to review this case as invoking the scintilla rule in the context of a summary judgment, in my opinion, is erroneous.
Our research, with able assistance of counsel, has disclosed several cases in point, each of which is consistent with the views expressed in the instant dissent. Typical of the language of those cases is the following from Rouse v. Pollard, 130 N.J.Eq. 204, 21 A.2d 801 (1941):
". . . [W]e do not understand that it is a characteristic function of the practice of law to accept clients' money for deposit and future investment in unspecified securities at the discretion of the attorney, and we find to the contrary." at 804.
See, also, Ellenstein v. Herman Body Company, 23 N.J. 348, 129 A.2d 268 (1957); Smith v. Travelers Indemnity Company, 343 F.Supp. 605 (M.D.N.C.1972); and Strauss v. New Amsterdam Casualty Company, 30 Misc.2d 345, 216 N.Y.S.2d 861 (1961). For the legal definition of "practice of law" in Alabama, see § 34-3-6, Code 1975.
It should be obvious to the reader that the problem with this case lies in its deeper *665 dimension: The plight of Ms. Watkins if her legal remedy against St. Paul fails. The organized Bar has no Client's Security Fund. Her chances of recovery against a disbarred lawyer would be nil. Her only wrong consists in her confidence in a lawyer who had represented her in various matters over a period of years and who had recently effected a substantial recovery of damages for the wrongful death of her husband. I realize, with keen sensitivity, that to affirm the trial Court would have the apparent effect of leaving the scales terribly unbalanced. But hard facts make bad law; and the rule of law is poorly served when we permit the proverbial blindfolded mistress, in whose hand we entrust the scales of justice, to peep.
EMBRY, J., concurs.
NOTES
[1] For an excellent in-depth discussion of this topic, see Hoffman, Alabama's Scintilla Rule, 28 Ala.L.Rev. 592 (1977).