BEATTY, Justice.
Appeal by plaintiff, Marlene Woods, as administratrix of the estate of Kenneth Woods, deceased, from summary judgment in favor of defendants Ray Perryman, Ruth Perryman Driggers, and Chris Perry-man, in plaintiffs action based upon negligence and wanton conduct in allowing a horse upon a highway, proximately resulting in the decedent’s death when the motorcycle he was riding struck the horse. We affirm.
At the time of the fatal occurrence, Ruth Perryman Driggers held bills of sale relative to her purchase of two horses, an Appaloosa and an Arabian. The horses were kept in a pasture on four acres of property at or near U.S. Highway 98 in Fairview, near Wilmer in Mobile County. Mrs. Driggers had been with the horses as late as 9:00 p.m. on the evening before the accident. According to her, as she was preparing to depart for work around 6:30 a.m., she sent her 17-year-old son, Chris Perryman, who lived in the family home, to feed the horses. He returned to inform his mother that the horses were not in the pen, whereupon Mrs. Driggers and her two sons, Chris and Ray Perryman, began a search. They found the Arabian dead at the scene of the accident. The accident had occurred a short time before, and a patrol car was at the scene. After talking with an officer, Mrs. Driggers was accompanied by him to the pen, where they found that the latch had been unlocked and the gate opened.
By affidavit, Chris Perryman stated:
“On October 24, 1983, I was living at the above address with my mother, Ruth Janet Driggers, and my brother, Ray Perryman. We had a fenced pasture at our home and my mother kept her Arabian and Appaloosa horses in that pasture. I did not own these horses; they belonged to my mother.
“At approximately 6:30 A.M. on the morning of October 24th, I went out to feed the horses. To get to the pasture, I had to go through a gate. The chain which we used to keep the gate closed and locked had been loosened and the gate was open. The horses were not in the pasture. My mother, brother, and I began looking for the horses and later found that the Arabian had been hit and killed.
“I did not let the horses out of the fence. The only time we ever took them out was when we went riding. I do not know who let the horses out. Sometime after the Arabian was killed, someone burned my mother’s tack house where she kept her saddles and other equipment used with the horses. We have never found out who set the fire.”
Originally, plaintiff’s complaint named Ruth Perryman Driggers and her son, Ray Perryman, as defendants, and asserted theories of negligence and wantonness in control over the horse. An amendment added averments of wantonness:
“(a) Wantonly failing to insure that said horse was confined in a pen, fenced area, stable, etc.
“(b) Wantonly causing or allowing said horse to be present on the above described highway.”
Defendants moved to dismiss the complaint, relying on Code of 1975, § 3-5-3:
“(a) The owner of such livestock or animal being or running at large upon the premises of another or upon the public lands, roads, highways or streets in the state of Alabama shall be liable for all damages done to crops, shade or fruit trees or ornamental shrubs and flowers of any person, to be recovered before any court of competent jurisdiction; provided, that the owner of any stock or animal shall not be liable for any damages to any motor vehicle or any occupant thereof suffered, caused by or resulting from a collision with such stock or other animal, unless it be proven that such owner knowingly or wilfully put or placed such stock upon such public highway, road or street where such damages were occasioned.”
This motion was not ruled upon.
Following the taking of depositions of Marlene Woods and Ruth Perryman Drig- *997 gers, Ray Perryman moved for summary judgment. That motion was granted.
Plaintiff then amended her complaint by adding Chris Perryman as a defendant, and adding a third cause of action alleging that the defendants “knowingly or wilfully” placed or put the horse on the highway. Chris and Ruth Perryman answered, and subsequently moved for summary judgment, which was subsequently granted. This appeal followed.
The question presented is whether the trial court erred in granting summary judgment in favor of each of the three defendants.
Familiar principles applicable to summary judgment were recited in Fountain v. Phillips, 404 So.2d 614, 617-18 (Ala.1981), and are repeated here:
“[Rule 56(e) provides:]
“ ‘(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.’ [Emphasis added in Phillips.']
[[Image here]]
“A motion for summary judgment may be granted only when there is no genuine issue as to a material fact and the moving party is entitled to a judgment as a matter of law. Butler v. Michigan Mutual Insurance Co., 402 So.2d 949 (Ala.1981); Studdard v. South Central Bell Telephone Co., 356 So.2d 139 (Ala.1978); Whitehead v. Davison Oil Co., 352 So.2d 1339 (Ala.1977).
“The burden is thus upon the moving party to clearly show that the non-mov-ant could not recover under any discernible circumstances, Whitehead v. Davison Oil Co., 352 So.2d 1339 (Ala.1977); Browning v. Birmingham News, 348 So.2d 455 (Ala.1977); Fleming v. Alabama Farm Bureau Mutual Casualty Insurance Co., 293 Ala. 719, 310 So.2d 200 (1975), and all reasonable doubts concerning the genuine issue of material fact must be resolved against the moving party. Campbell v. Alabama Power Co., 378 So.2d 718 (Ala.1979); Donald v. City National Bank of Dothan, 295 Ala. 320, 329 So.2d 92 (1976); Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975).
“This burden is substantially increased by the scintilla evidence rule. The scintilla rule requires that a summary judgment not be granted if there is a scintilla of evidence supporting the position of the nonmovant. Browning v. Birmingham News, 348 So.2d 455 (Ala.1977); Folmar v. Montgomery Fair Co., 298 Ala. 686, 309 So.2d 818 (1975). A scintilla of evidence requires only a mere gleam, glimmer, spark, the least bit, or the smallest trace in support of the nonmoving party to defeat a summary judgment motion. Watkins v. St. Paul Fire and Marine Insurance Co., 376 So.2d 660 (Ala.1979).”
According to Marlene Woods, certain of her testimony furnished a scintilla of evidence against the defendants and should have prevented summary judgment. Specifically, Mrs. Woods argues that “she was told by Ray Perryman that Chris Perryman let the subject horse out of the pen thereby causing or allowing it to collide with Kenneth Woods resulting in his death.”
In that connection, Mrs. Woods described her telephone conversation with Ray Perry-man:
*998 “A. He called me.
“Q. He called you?
“A. Right.
“Q. Were you at home?
“A. Yes, I was.
“Q. And did he tell you it was Ray Perryman?
“A. Yes, he did.
“Q. What did you all talk about that time?
“A. He asked me was I going to sue them.
“Q. This was in January?
“A. Yes.
“Q. Of this year or last year?
“A. ‘Eighty-four.
“Q. Okay. I’m sorry. Go ahead.
“A. And I told him that I would imagine — I thought that, yes, I was.
“Q. Did he say anything in response to that?
“A. He asked did I have an attorney.
“Q. What did you tell him in response?
“A. I said, yes, I do.
“Q. Did he say anything in response to that?
“A. He just said, again, that he hated it, and he said that his little brother— didn’t call any names, just said, my little brother let the horses out of the pen.
“Q. You say he didn’t mention any names.
“A. No, just ‘my little brother.’
“Q. You have a specific recollection of that?
“A. Yes.
“Q. I mean, that he said that his little brother let the horses out of the pen?
“A. Yes.
“Q. Anything else?
“A. He just said that there [was] some kind of confusion between himself and his little brother, and the way I understood, some jealousy between the two of them and their mother.
“Q. Tell me about that, because I’m not sure I understood you. You may not have understood him, but tell me what you understood [him] to say to you.
“A. That he and his little brother, or that his little brother had something against him, a little jealousy.
“Q. That his little brother was jealous of him, ‘him’ being Ray?
“A. Yes, and jealousy over the mother, between' the two brothers and the mother. That’s the—
“Q. Did he tell you that’s why the little brother let the horses out of the pen, or is that something separate that he was telling you altogether?
“A. He told me that’s why he thought his little brother let the horses out of the pen — mad at him.
“Q. Did he tell you that he thought his little brother let the horses out of the pen?
“A. He said, his little brother let the horses out of the pen.
“Q. But that he thought the reason that his little brother had done it was because they were feuding with each other or angry with each other?
“A. He didn’t actually say he thought it but — in other words, that they were having a confusion—
“Q. When you say ‘a confusion,’ you mean fighting with each other?
“A. Some kind of conflict.
“Q. So did he tell you — and that’s what I misunderstood you on earlier— are you telling me that he didn’t tell you that his little brother did it because he was mad at him?
“A. I’m not telling you that he said his little brother didn’t do it. I’m telling you that he said his little brother did do it.
“Q. I understood you when you answered that. What I’m saying is did he tell you or give you a reason as to why his little brother had done it, that you heard him say? That’s what I’m asking you.
“A. Specifically, no.
“Q. Okay. Are you telling me that’s what you gathered from what he was telling you?
“A. Correct.
*999 “Q. He didn’t use the precise words that that was why his little brother had done it?
“A. No.
“Q. You just sort of assumed that, based on what he told you about the conflict between the two of them?
“A. Yes.
“Q. Did he tell you what the conflict was about?
“A. Specifically, no.” (Emphasis added.)
As we understand plaintiffs argument, it is that the fact that Ray Perryman asked about Mrs. Woods’s having an attorney disclosed his apprehension of suit against him, and his further statement that his “little brother” had “let the horses out,” were evidence of motive and intention which would foreclose summary judgment. This, argues plaintiff, implicated Ray, as it was a statement against interest and thus was a scintilla of evidence admissible on the issue of knowledge and willfulness.
Of course, Ray Perryman was a party, and a party’s declarations that are inconsistent with his position may be considered admissions whether or not tested by the same conditions as for a declaration against interest, Cleary, McCormick on Evidence, § 262 at 629-30 (2d ed. 1972); C. Gamble, McElroy’s Alabama Evidence, § 180.01(4) (3d ed. 1977), and are admissible as substantive evidence. The question is whether these statements furnish a scintilla when measured against the elements of plaintiff’s cause of action. Specifically, was this evidence that the defendants willfully or knowingly caused or allowed the horse to run at large on the highway?
This Court, as recently as Cochran v. Williams, 468 So.2d 168, 169-70 (Ala.1985), expressed the controlling principles in such cases:
“In [Ex parte] Jackson, 378 So.2d 1112, 1114 (Ala.1979), the Court, construing [Code of 1975,] § 3-5-3, stated:
“ ‘Our cases have consistently held that there is no cause of action under § 3-5-3 for a plaintiff-motorist who is injured because his car collided with livestock which had strayed onto a highway through the negligence, gross negligence or recklessness of its owner. In Randle v. Payne, 39 Ala.App. 652, 107 So.2d 907 (1958), where a bull owner was being sued under Code 1940, Tit. 3, § 79, (the predecessor of § 3-5-3) by the driver of a truck that collided with the bull on Highway 11, the Court of Appeals held: “There must be proof to the effect that the owner of the stock knowingly or wil-fully placed the stock upon the public highway.” Randle, supra, 39 Ala. App. at 656, 107 So.2d at 910. In McGough v. Wilson, 273 Ala. 179, 137 So.2d 43 (1962), which case likewise involved the collision of a motor vehicle and a bull on a public highway, this court took note of the Randle decision and stated: “[I]ts majority opinion held, in effect, that an owner of livestock is not liable in damages to a motorist involved in a collision with his livestock for negligence in permitting the stock to be on the highway in view of the statute.” McGough, supra, 273 Ala. at 182, 137 So.2d at 45. In McGough this court added:
“ ‘ “Knowingly and willfully doing an act is different from inadvertently doing the same act, OR PERMITTING IT TO BE DONE THROUGH INADVERTENCE OR NEGLIGENCE.”
“ ‘McGough, supra, 273 Ala. at 182, 137 So.2d So.2d at 45 [emphasis in Jackson ].
“ ‘In reference to the two cases referred to above, the Court of Civil Appeals in Carter v. Alman, 46 Ala.App. 633, 247 So.2d 676 (1971), a factually similar case, stated:
“ ‘ “THESE CASES PLAINLY STATE THAT FOR RECOVERY, A MOTORIST MUST SUBMIT PROOF THAT THE OWNER OF THE FEAS-ANT BEAST PLACED OR PUT IT UPON THE HIGHWAY WITH A ‘DESIGNED SET PURPOSE, INTENTION, OR DELIBERATION.’ EVIDENCE OF NEGLIGENCE OR GROSS CARELESSNESS IS NOT ENOUGH. There was no evidence in- *1000 traduced by appellant in the trial below with the slighest tendency to indicate acts of such nature by appellees.”
“ ‘Carter v. Alman, 46 Ala.App. at 635, 247 So.2d at 677 [emphasis in Jackson ].
“ ‘Justice Maddox explained the legislative intention behind Code 1940, Tit. 3, § 79 (the predecessor of Code 1975, § 3-5-3) in the following language:
““‘WE THINK THE LEGISLATURE, IN ADOPTING THE PROVISION IN SECTION 79 INTENDED TO MAKE THE OWNER OR KEEPER OF STOCK IN AREAS OUTSIDE MUNICIPALITIES (which had adopted stock laws or which enacted stock laws afterward) LIABLE FOR DAMAGES IN MOTOR VEHICLE ACCIDENTS CAUSED BY LIVESTOCK ONLY WHERE THE OWNER OR KEEPER KNOWINGLY OR WIL-FULLY PLACED OR PUT THE LIVESTOCK ON THE HIGHWAY, ROAD OR STREET.”
“ ‘Chandler v. Waugh, 290 Ala. 70 at 74, 274 So.2d 46 at 49 (1973) [emphasis in Jackson ].’ ”
What the plaintiff has proffered is evidence of a statement by one brother that another brother “let the horses out of the pen,” plaintiffs conclusion that this was done because of a form of sibling rivalry or discord, and evidence of an inquiry on the possibility of a lawsuit. Under the plain language of the governing principles, plaintiffs evidence does not offer the slightest reasonable inference that Ray’s brother, Chris Perryman, “ ‘knowingly or wilfully placed or put the livestock on the highway.’” Cochran, supra.
Accordingly, the trial court did not err in granting summary judgment. Let the judgment be affirmed.
AFFIRMED.
MADDOX, SHORES, HOUSTON and STEAGALL, JJ., concur.