[Civ. No. 53649. Second Dist., Div. Three. Mar. 27, 1979.]

MARGARET MILLER et al., Plaintiffs and Appellants, v.
LEWIS METZINGER et al., Defendants and Respondents.

Counsel

Flame, Sanger, Grayson & Ginsburg, Frank & Rappaport and Ronald S. Sofen for Plaintiffs and Appellants.

Greg M. Oester for Defendants and Respondents.

Opinion

**POTTER, J.**—Plaintiffs Margaret Miller (hereinafter Miller) and her adult children (Larry, Michael and Karen Miller) appeal from a summary judgment in favor of defendants Lewis Metzinger (hereinafter Metzinger) and Sepulveda & Metzinger, a professional corporation, in plaintiffs' suit for attorney malpractice.

A prior action for wrongful death (medical malpractice against two doctors and a hospital) brought by plaintiffs as heirs of Jack Miller was decided in favor of the defendants therein after a bifurcated trial of the defense of statute of limitations (Code Civ. Proc., § 340.5). Jack Miller died on January 4, 1973, and plaintiffs were found to be chargeable with knowledge of the cause of his death as of that date. The suit was not commenced until January 30, 1974.[1]

The complaint in the case at bench charged four different attorneys or law firms with negligently failing to bring the wrongful death action within the applicable statute of limitations. It alleged that the first attorneys consulted (in early 1973) were Rudofsky & Meo, and that after they obtained copies of decedent's medical records they declined to handle the matter. However, the records were sent to the second attorney, Bernard Echt, who retained them until on or about December 28, 1973. The third firm, Sepulveda & Metzinger, allegedly became involved when plaintiffs consulted Metzinger on or about July 1, 1973, but this firm also withdrew. The allegations in this respect were: "On or about November 1, 1973, Lewis Metzinger informed Plaintiffs that he did not have sufficient expertise to handle a medical malpractice cause of action and referred Plaintiffs to Defendants, Cheren & Goldberg. On or about

---

[1]These facts with regard to the wrongful death action are set forth in the unpublished opinion of Division Two of this court in *Miller v. Davidson,* 2d Civ. No. 50902 (filed Mar. 1, 1978) of which this court has taken judicial notice pursuant to Evidence Code sections 452, 455 and 459.

December 1, 1973, Defendants, CHEREN & GOLDBERG, agreed to handle the matter for Plaintiffs. A written retainer agreement was entered into. Said written retainer agreement was entered into on or about December 26, 1973."

Plaintiffs did not allege which defendant was in possession of the file on January 4, 1974, only that the complaint filed January 30, 1974, "after the statute of limitations had run" was filed by defendants Cheren & Goldberg.

Between the filing of the complaint and the summary judgment, discovery was undertaken, including depositions of Miller and of defendants Metzinger and Matthew Meo, and interrogatories were answered by plaintiffs.

Defendants Meo, Meo & Rudofsky, and Bernard Echt were voluntarily dismissed.

In June 1977, defendants Metzinger and Sepulveda & Metzinger filed a motion for summary judgment. This motion was heard August 29, 1977. Prior to the hearing, the original depositions of Matthew Meo and Metzinger with attached exhibits were completed and filed. The deposition testimony of plaintiff Miller was presented by the moving defendants through the declaration of Victor Sepulveda which stated that he took the deposition and that exhibit A attached to the declaration is a "transcript of the deposition."[2]

In addition to the deposition testimony, the moving defendants submitted three declarations of Metzinger.

In opposition, plaintiffs relied upon the deposition testimony, upon the declaration of David H. Cheren, and upon the opposition declaration of Miller.[3] Miller did not attempt to correct or qualify any of her deposition testimony.

---

[2]The transcript comprised 56 pages of questions and answers, and the 57th page was a certificate of the reporter stating that the transcript "is a true record of the testimony of the witness." The deposition as attached also included three exhibits, an unsigned form of contingency agreement with Rudofsky and Meo, having blanks filled in referring to decedent's "accident" on December 6, 1972, an information authorization to Rudofsky & Meo, signed by Miller on March 2, 1973, and a retainer agreement dated January 21, 1974, between Miller and defendants Cheren & Goldberg, per Hal Williams.

[3]This declaration is in the superior court file which, pursuant to rule 12(a), California Rules of Court, has been transmitted to this court and made a part of the record on this appeal.

Certain basic facts, as shown by the deposition testimony and declarations, were undisputed. In early 1973, Miller contacted Rudofsky & Meo with respect to the wrongful death claim arising out of Jack Miller's death. She gave them a written authorization dated March 2, 1973, to obtain the medical records, which they did obtain. These were forwarded by Meo to Bernard Echt for his evaluation and were still in his possession in December 1973. At some time in 1973, Miller consulted with Metzinger[4] concerning the wrongful death claim and ultimately Metzinger advised her that he was unable to handle the case because he "did not have sufficient expertise in medical malpractice." Metzinger summarized, ". . . I met with her one time and wrote down a statement of the facts of the case, evaluated my ability to handle the case, met with her again to tell her I couldn't handle the case and sent her to somebody else." It was also undisputed that (1) the firm to which plaintiff was sent was Cheren & Goldberg, (2) plaintiff Miller did retain Cheren & Goldberg to prosecute the claim, and (3) a retainer agreement (not necessarily the first) was executed by Miller and by that firm on January 21, 1974, after the statute of limitations had already run on the wrongful death claim.

An additional undisputed fact of critical importance was that Metzinger sent a letter to Meo, dated December 27, 1973, which read as follows:

"December 27, 1973

"Meo & Rudofsky
16255 Ventura Boulevard, Suite 1008
Encino, California 91316

 "Re: Jack Miller, Deceased
 (Possible malpractice)

"Dear Mr. Meo:

"Pursuant to our conversation regarding the above-captioned matter I am writing you this letter to indicate to you that we are possibly interested in taking over this file.

---

[4]According to Meo, he advised Miller prior to June 1973 that he declined to take the case; Miller testified that she sought other counsel because she got no action out of Meo.

"It is my understanding that this file is presently in the hands of Attorney Bernard Echt and that you are attempting to return this file to your office. As soon as you have had an opportunity to have this file returned to your office, I would request that you have your secretary contact my office so that I may come over to see you and review the file to see if we will, in fact, take the case. It is my understanding that the statute of limitations on this matter is running shortly. I, therefore, would appreciate any assistance that you could give us in promptly setting up a date for my review of the file.

"I remain,

"Sincerely yours,

SEPULVEDA & METZINGER

By /s/ LEWIS METZINGER
LEWIS METZINGER"

LM:ck

Beyond those above recited, the facts were uncertain or there were conflicts. There was great uncertainty as to the dates when (1) Miller contacted Metzinger, and (2) Metzinger advised Miller of his inability to handle the case and referred her to Cheren & Goldberg. The unverified complaint alleged that the original consultation was on or about July 1, 1973, and that "[o]n or about November 1, 1973, Lewis Metzinger informed Plaintiffs that he did not have sufficient expertise to handle a medical malpractice cause of action and referred Plaintiff to Defendants, Cheren & Goldberg."

In her deposition, Miller testified that she saw Metzinger two or three times but could not remember the dates because she "was going through a very trying period at that time." She could not say whether it was more than six months or less than six months after her husband died. She was equally unable to date this event by reference to the succeeding contact with Cheren & Goldberg. She did testify that this contact was in 1973 and when asked if it was "before the month of December" said, "I am sure it must have been." However, when admonished not to guess, plaintiff stated, "I don't know," and in her declaration in opposition, Miller stated, "I do not know when these meetings or conversations occurred."

Metzinger's deposition testimony was equally uncertain as to the dating of these conversations. When asked if he had any contact with Miller at all during the year 1973, Metzinger answered, "I honestly don't know." Specifically, he could not state whether his last meeting with Mrs. Miller was before or after he wrote the December 27, 1973, letter to Meo and Rudofsky. This testimony contrasted with the statement in Metzinger's declaration executed some weeks later in which he stated that he advised plaintiff that he would attempt to get the medical records from her then present attorney, was unsuccessful in that attempt, and in November 1973, told her that he would be unwilling to undertake the representation.

The deposition testimony of Meo also bore upon the dating of the contacts between Miller and Metzinger. He testified that the December 27, 1973, letter, as indicated by the statement therein that it was written "[p]ursuant to our conversation" was preceded by a phone conversation of like content, and that a handwritten notation on the original of the letter, "Called Echt 12-28-73, 2:30" was in his handwriting and reflected the fact that on that date he called Bernard Echt and asked for the records.

There was also considerable uncertainty as to the content of the discussions between Miller and Metzinger. In his deposition, Metzinger stated that he did not "remember any of the substance" of the conversations he had with Mrs. Miller and could not say whether he ever advised her that an action "should be filed on her behalf prior to one year from the day of her husband's death." When asked, "Did you ever agree to perform any work on Margaret Miller's children's behalf in connection with the medical-malpractice claim?" he answered, "I don't know." However, in his declaration, Metzinger stated that Miller asked him to investigate the case, that he had advised her that in order to do so it was necessary to examine the medical records and suggested he would obtain them from her present counsel, but "never indicated at this time that I would undertake this matter nor represent her." In the declaration Metzinger summarized: "At no time during any conversation or consultation period did I agree to represent Mrs. Miller in any regard to this claim . . . . My entire relationship to this action was of an investigatory nature."

The testimony of plaintiff Miller, however, concerning their conversation was as follows:

"Q. [by Mr. Sepulveda] At this particular time did you enter into any kind of an agreement with Mr. Metzinger with regard to your case?

"A. Yes. At that time he said he didn't understand the hospital records. He said he was going to have Max read them, and then he never sent them to Max and he—Max is Dr. McElroy[5] and he said that he would take care of it or have somebody take care of it that knew about trying malpractice lawsuits." Moreover, Miller was emphatic—that "no attorney advised [her] of the statute of limitations within that year of [her] husband's death," and specifically stated ". . . Metzinger never gave me any advice whatsoever as to what action to take to preserve my medical malpractice cause of action."

Another matter on which the record was unclear was whether Metzinger contacted Cheren & Goldberg in connection with the reference or merely sent Miller there. In his deposition, Metzinger said he did not "believe" that he contacted Cheren & Goldberg prior to referring Miller because it was "not my usual practice." Miller, however, testified in her deposition that she believed "he called up and made arrangements for me to make an appointment to go see him." In Miller's opposition declaration, she stated that Metzinger "made an appointment for me to see the law firm of Cheren & Goldberg."

On August 29, 1977, the motion for summary judgment was submitted upon the depositions and declarations, the memoranda of points and authorities, and oral argument. On that date the motion was granted, followed by the judgment entered November 9, 1977.

### Contentions

Plaintiffs contend that the motion for summary judgment was improperly granted inasmuch as there were issues of fact as to (1) the date upon which Metzinger informed plaintiff Miller that he would not represent her, (2) whether Metzinger advised plaintiffs as to the running of the statute of limitations, and (3) when plaintiffs established an attorney-client relationship with Cheren & Goldberg. Plaintiffs also contend that the declaration of Victor Sepulveda improperly incorporates the deposition testimony of plaintiff Miller. Defendants controvert all of plaintiffs' contentions.

---

[5]Dr. McElroy was a veterinarian who was a mutual acquaintance of Miller and Metzinger.

*Discussion*

*Summary*

██ Issues of fact remain as to whether an attorney-client relationship was established between plaintiffs and Metzinger, and as to the duration of that relationship. If it continued to the date indicated by the December 27, 1973, letter from Metzinger, defendants were obligated to advise plaintiffs of the imminent bar of the statute of limitations, and there is no claim that they did so. It has not been shown that the failure of Cheren & Goldberg to file the complaint on time did not result from plaintiffs' lack of appreciation of the statute of limitations. Consequently, we conclude that the motion for summary judgment was improperly granted and it is unnecessary to reach plaintiffs' objection to the form in which the deposition of Miller was presented.

*There Is an Issue of Fact as*
*to the Existence of the*
*Attorney-Client Relationship*

The deposition testimony of plaintiff Margaret Miller describes an agreement under which defendant Metzinger undertook to obtain medical records necessary to an evaluation of the wrongful death claim and to advise concerning appropriate action to be taken. Metzinger "would take care of it or have somebody take care of it that knew about trying malpractice suits." Metzinger's statements in his declaration that his function was purely investigatory and that he did not agree to represent her, charge any fee for his services or secure a retainer agreement do not suffice to eliminate the existence of an attorney-client relationship.

██ As our Supreme Court said in *Perkins* v. *West Coast Lumber Co.* (1900) 129 Cal. 427, 429 [62 P. 57]: "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie.*" The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising.

In *People* v. *Singh* (1932) 123 Cal.App. 365 [11 P.2d 73], communications made by a criminal defendant to an attorney were held privileged despite the fact that they failed to agree upon a fee arrangement.

In *Tormo* v. *Yormark* (D.N.J. 1975) 398 F.Supp. 1159, the question was whether an attorney who had referred a matter to out-of-state counsel had incurred liability by virtue of the latter's defalcation. In response to defendant's contention that no attorney-client relationship was shown, the court said (*id.,* at p. 1169): "Devlin's initial contention is that '[i]t is not at all clear that [he] was involved in an attorney-client relationship. with the plaintiffs.' Brief in Support of Third-Party Defendant's Summary Judgment Motion at 22-23. He points out that a formal retainer agreement was never executed and a fee never paid. But the law of New Jersey *imposes the duties incident to such a relationship on one who merely 'assumes to give legal advice and counsel.'* Shoup v. Dowsey, 134 N.J.Eq. 440, 475-76, 36 A.2d 66 (Ch. 1944). *Accord, In re Equitable Office Bldg. Corp.,* 83 F.Supp. 531, 562 (S.D.N.Y. 1949); *Central Cab Co.* v. *Clarke,* 259 Md. 542, 270 A.2d 662, 666 (1970); *In re Carr's Estate,* 371 Pa. 520, 92 A.2d 213, 218 (1952). Neither contractual formality nor compensation or expectation of compensation is required. *Shoup v. Dowsey, supra,* 134 N.J.Eq. at 475-76, 36 A.2d 66. Devlin does not contend that his promise *'to see what could be done with regard to settlement'* was an agreement to perform services nonlegal in character. *Compare Ellenstein v. Herman Body Co.,* 23 N.J. 348, 129 A.2d 268 (1957), *with* Devlin Deposition at 10. That undertaking was sufficient as a matter of law to impose upon him the duties owed by an attorney to his clients in his relationship with the Wendels." (Italics added.)

In *Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311, 1319, the court said: "The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result. [Fn. omitted.]"

 It thus appears that despite the fact that no retainer was signed between plaintiffs and defendant Metzinger, an attorney-client relationship giving rise to fiduciary obligations could rest upon the version of their arrangement testified to by plaintiff Miller.

*There Is an Issue of Fact as to
the Time When Metzinger Referred
Plaintiffs to Cheren & Goldberg*

The allegations of the complaint do not forever set in concrete the date upon which defendant Metzinger advised plaintiffs of his inability to

handle the wrongful death litigation for them.[6] In her deposition, plaintiff Miller also gave answers which would perhaps support a claim that Metzinger declined the representation and referred her to Cheren & Goldberg earlier than the date upon which Metzinger wrote Meo (Dec. 27, 1973) asking for the medical records. Her testimony in this respect, however, is by no means conclusive against plaintiffs since it is apparent that she did not have any accurate recollection of these dates. Metzinger's attempt in his declaration to definitely date this event as "[i]n November of 1973" is belied (1) by his deposition testimony in which he admits his total inability to fix such date, and (2) by his admission that the December 27, 1973, letter to Meo was signed and mailed by him. An examination of that letter shows that by itself it constitutes substantial evidence that as of its date Metzinger had not advised plaintiffs of his inability to handle their case. He testified that there were two meetings: one at which he elicited facts for evaluation, followed by such evaluation, and a second meeting at which he advised he "couldn't handle the case." An attorney who had so advised plaintiffs normally would not indicate interest "in taking over [the] file." Therefore, the letter gives rise to a clear inference that Metzinger declined to handle the case subsequent to December 28, 1973. Consistent with this evidence is the declaration of Cheren to the effect that the records of his office show that the first conference between plaintiff Miller and any member of his firm was January 18, 1974.

It is, therefore, apparent that there is a serious issue of fact in the case as to whether Metzinger advised the plaintiffs to seek other representation at any time prior to a date when the one-year statute of limitations had run or was about to run within a matter of a few days.

*There Is a Genuine Issue as to Whether There Was a*
*Breach of Duty to Plaintiffs by Metzinger's Failure*
*to Advise Concerning the Statute of Limitations*

Plaintiff Miller's declaration and her deposition both indicate that she was never advised by Metzinger of the bar of the statute of limitations. He does not attempt to take issue with her in this respect. If, therefore, the correct dating of the conversation, which both of them agreed occurred prior to her seeking representation with Cheren & Goldberg, is subsequent to the December 27 date of Metzinger's letter to Meo, defendants have failed to negate the existence of a breach of duty.

---

[6]The complaint is not verified and appears to have been prepared by counsel without access to specific information as to the date, which is still in question. An amendment to conform to proof will be appropriate when, through discovery or otherwise, plaintiffs can fix the date more precisely.

Metzinger's letter of December 27 clearly states his understanding that the statute of limitations "is running shortly." This implies that he was advised by Miller of the date of her husband's death. Since that date was January 4, 1973, he presumably knew that plaintiffs had only until January 4, 1974, within which to commence the action. Even if it be assumed that Metzinger did not wait any substantial period to receive the medical records before declining the case, a breach of duty could be found in his failure to advise plaintiffs of the necessity to act promptly in contacting Cheren & Goldberg, in view of the fact that there were only a few days remaining within which to institute an action.

According to the declaration of Miller, Metzinger made the appointment for her with Cheren & Goldberg. If that is true and if the appointment was not until late January, there was a breach of duty. It appears, therefore, that in order to prevail on this issue, defendants were required to conclusively negate Miller's testimony or show that the appointment was prior to January 4. They did neither.

Moreover, in view of Metzinger's apparent knowledge of the statute of limitations problem, a breach of duty to plaintiffs might exist even though he left it up to Miller to make the appointment. If, as her deposition and declaration indicate, she was given no advice as to the statute of limitations (when Metzinger declined the case on the basis of his lack of expertise, at a time when there remained only a few days within which to commence the action), there was a breach of duty.

■ Upon a motion for summary judgment, the moving party is required to negate all of the resisting party's claims, including those on which the resisting party has the burden of proof. (*Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444].) ■ Thus, though at trial plaintiff will have the burden of proving a breach of duty on the part of the moving defendants, to sustain a summary judgment on this issue defendants were required to negate the existence of a duty or a breach by an uncontradicted showing. No such showing was made; consequently, the summary judgment must be reversed.

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with the views above expressed.

Cobey, Acting P. J., and Allport, J., concurred.