[No. B128560. Second Dist., Div. Two. Feb. 17, 2000.]

GULF INSURANCE COMPANY, Plaintiff and Appellant, v. BERGER, KAHN, SHAFTON, MOSS, FIGLER, SIMON & GLADSTONE et al., Defendants and Respondents.

COUNSEL

Celebrezze & Wesley, Bruce D. Celebrezze and Jeffrey P. Miller for Plaintiff and Appellant.

Haight, Brown & Bonesteel and Thomas N. Charchut for Defendants and Respondents.

OPINION

MALLANO, J.*—Gulf Insurance Company (Gulf) appeals from a summary judgment rendered against it on its complaint for legal malpractice and breach of contract against defendants Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone (Berger Kahn) and its named partner, Leon Gladstone (Gladstone) (collectively, Berger Kahn and Gladstone; referred to as Berger Kahn defendants). Gulf contends that the trial court erroneously concluded that it lacked standing to sue the Berger Kahn defendants and that it failed to present a triable issue of material fact with regard to causation. Since we

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

conclude that Gulf had standing and that the Berger Kahn defendants failed to meet their burden with regard to causation, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This legal malpractice action arises from the Berger Kahn defendants' defense of Gulf's insureds in a previous lawsuit entitled *Coleman v. Singer* (Super. Ct. L.A. County, 1994, No. BC114420) (*Coleman* Action).

### A. The Coleman Action

In the *Coleman* Action, Thomas Coleman sued Nathan Singer (Singer), Signature Agency, Inc. (Signature), American Express Company, and Forum Insurance Company (Forum) (collectively, all defendants except Singer are referred to as the Plan defendants).[1] Coleman alleged that he had joined a legal services plan offered by American Express and administered by Signature which offered legal services at reduced rates and that Singer, a plan participant attorney, had committed malpractice in handling Coleman's bankruptcy and related issues. In addition to a cause of action for legal malpractice against Singer, the causes of action against the Plan defendants relevant to this appeal are: the second cause of action for breach of contract, in which Coleman alleged that the Plan defendants breached their agreement by failing to provide legal services of the promised quality, the third cause of action for negligently failing to investigate Singer's qualifications and abilities and negligently referring the *Coleman* matter, which he was incapable of handling, to him, the fourth cause of action for negligently misrepresenting the quality of the plan's services, that references of all plan attorneys were checked and that Singer was capable of handling Coleman's legal problems, and the fifth cause of action (against only Forum) for breach of contract as a third party beneficiary, asserting that the Plan defendants breached their agreement by failing to provide quality legal services.

### B. The Present Action Against the Berger Kahn defendants

On January 9, 1997, Gulf filed a first amended complaint for damages for malpractice against the Berger Kahn defendants. The alleged malpractice arose out of the Berger Kahn defendants' representation of the Plan defendants in the *Coleman* Action. That complaint alleged that the Berger Kahn defendants were negligent by, among other things, failing to conduct any

---

[1]Coleman also sued "Legal Services Plan, business entity unknown," which is not involved in this appeal and appears to have been only the name used by the Plan defendants to conduct their prepaid legal services business.

written discovery, depositions, factual investigation, legal research, or any other action to defend the Plan defendants and protect the interests of Gulf, failing to provide competent advice to Gulf, and tendering the defense of the Plan defendants to Singer's malpractice carrier, though Singer had policy limits of only $100,000 while the claims asserted exceeded $4 million.

On December 1, 1997, pursuant to an order granting Gulf's motion to do so, the second amended complaint was filed. This complaint differed from the first amended complaint in that it added a cause of action alleging that Berger Kahn breached a contract with Gulf to provide representation to the Plan defendants. The Berger Kahn defendants filed their general denial of the material allegations of the second amended complaint, along with 24 affirmative defenses. These included the defenses that both causes of action failed to state a claim (first affirmative defense), and that Gulf lacked standing to assert its claims (15th affirmative defense).

### C. *The Summary Judgment Motion*

On July 23, 1998, the Berger Kahn defendants filed a motion for summary judgment contending that Gulf lacked standing to sue them and that there were no facts to establish that their alleged negligence caused Gulf any damages. Much of the evidence and argument in connection with the motion focused on the question of, as the trial court put it, "who hired Berger, Kahn." Thus, we will first review the evidence submitted in connection with the summary judgment motion related to this issue.

In the two to three years before the *Coleman* Action was filed, the Plan defendants had retained the Berger Kahn defendants on several occasions. With respect to the *Coleman* Action, Joseph Conley (Conley), an officer and deputy general counsel for The Signature Group[2] (of which Signature was apparently a member), retained the Berger Kahn defendants to represent the Plan defendants. On October 26, 1994, Montgomery Ward Enterprises (MWE), Signature's parent company, wrote to the Berger Kahn defendants, transmitting "a copy of our entire file on the above-captioned [*Coleman*] lawsuit." The letter noted that Singer had been dropped from the plan the previous July because he was suspended for one year, and placed on probation for two, by the State Bar. It also noted that there had been some prior complaints about him from plan members. The letter concluded: "I look forward to working with you and your law firm on this matter." By letter of October 27, 1994, the Berger Kahn defendants confirmed receipt of the *Coleman* material and thanked Signature for the referral.

Gulf had issued a "Specialty Errors and Omissions Coverage" policy with limits of $5 million for each claim in excess of a $100,000 deductible and a

---

[2]The legal plan was operated through two or three companies in The Signature Group.

claims made excess policy with limits of $5 million to MWE, with Signature and Forum named as additional insureds. By letter of October 26, 1994, Signature tendered the *Coleman* summons and complaint to Sidney Hill (Hill), an attorney with Media Professional Insurance, Inc. (Media Professional), which underwrote, manages and made coverage determinations with regard to the litigation of several different carriers, including Gulf. The letter stated: "We have referred this file to the firm of Berger Kahn Shafton Moss Figler Simon & Gladstone. We understand that they were recently added to your list of 'Approved Counsel.' Accordingly, the case will stay with the firm."

On November 10, 1994, Hill wrote to Conley acknowledging receipt of the *Coleman* action. He also acknowledged coverage for the negligence and negligent misrepresentation claims, but indicating that claims for or arising out of breach of contract were not covered, nor were claims for errors before the retroactive date of the excess policy. In assuming the defense, Hill stated that Gulf was doing so with "a full reservation of [all] rights under the law and the insurance policies . . . . We also wish to advise you that we have approved the Berger Kahn firm to handle the defense of Montgomery Ward Enterprises or related entities under the Montgomery Ward policies. . . . We do expect . . . that they [Berger Kahn] will continue to keep us advised. We also expect Berger, Kahn to work within the defense guidelines which all approved defense counsel are required to work within."

On November 21, 1994, Debra Sucher, for Signature, responded to Hill's letter, acknowledging receipt and stating "After reviewing your letter, we at this time, choose not to disagree with your position regarding coverage under the pertinent policies."

On November 10, 1994, the same date Hill wrote Conley at Signature, he also wrote to the Berger Kahn defendants stating that Gulf "consent[s] for your firm to represent the interests of Montgomery Ward Enterprises, Inc. in the . . . [*Coleman* Action]. [¶] Your retention is conditional, however, subject to your reaching an agreement with Gulf . . . , which Media/ Professional represents, regarding the terms of your representation." The letter set forth Gulf's written defense guidelines, which were used by Media Professional as its standard retainer agreement for approved defense counsel (but not for *Cumis* counsel). Berger Kahn was required to provide Gulf with a report of the exposure, settlement posture, needed discovery and legal research and related issues and a budget of the anticipated litigation costs. The guidelines required that "[t]hroughout the life of this claim, you will need to make sure Media/Professional participates in key decisions involving strategy, motions, discovery, experts and, of course, settlement." The

letter also set forth an hourly rate for Berger Kahn's services and requested that Berger Kahn sign the letter and return it.

Before signing Hill's letter, Berger Kahn negotiated an increased hourly billing rate, which was then interlineated by hand on the letter. By letter dated February 8, 1995, on the Berger Kahn letterhead, Berger Kahn returned the November 10, 1994 letter, executed by Gladstone under the signature block "Montgomery Ward Enterprises, Inc.," along with a more detailed budget than requested because "this case is rather complex." In its cover letter, Berger Kahn stated that: "[i]f for any reason, you are not completely satisfied by the preliminary budget, *or any other work product we provide,* please contact me immediately." (Italics added.)

The record does not reflect that the Berger Kahn defendants ever raised any conflict of interest in representing both the Plan defendants and Gulf, or ever sought to be appointed *Cumis* counsel. The Plan defendants never suggested that there was any conflict in Berger Kahn's representation until nearly a year later, only after Berger Kahn had substituted out of the case and new counsel, Wilner Klein & Siegel (Wilner firm), substituted in. Then (a week or so before trial), there was a spate of letters between Conley and Hill regarding Media Professional's right to review the files in the *Coleman* Action, which it needed to assess liability, coverage and damages. Signature indicated that in light of the reservation of rights, those files could not be used with regard to coverage issues.

Shortly after Berger Kahn began representing the Plan defendants, it sent a letter to Singer's malpractice carrier, Home Insurance Company (Home) tendering the defense of the *Coleman* Action. Singer's Home policy only had coverage limits of $100,000, which were reduced by defense costs. Finally, in early August of 1995, Home first advised Berger Kahn that it would accept the defense of the Plan defendants. The Wilner firm substituted into the action on behalf of the Plan defendants on September 18, 1995, but Berger Kahn did not provide them with the case files until October 18, 1995. By that time, the matter was less than two weeks from trial and too late to test the "very credible defenses."

While Berger Kahn was counsel for the Plan defendants, it set out its litigation plan in the case, which it described as "complex," and provided a detailed litigation budget which allocated anticipated legal fees for depositions, interviewing witnesses, reviewing files, and conducting legal research and discovery. Berger Kahn's managing partner, Allen Michel (Michel), submitted a memorandum outlining a defense plan which suggested retention of tax and bankruptcy experts to evaluate the actions taken by Singer in

representing Coleman. Michel also indicated his belief that the Plan defendants might have no liability based on analogous case law. Despite its plans in connection with the litigation, correspondence from the Wilner firm to the Plan defendants asserted that Berger Kahn did virtually none of the work that it outlined needed to be done.

As the result of Berger Kahn's lack of preparation, Samuel Wilner (Wilner) of the Wilner firm advised that he could offer no opinion as to the Plan defendants' exposure in the litigation as a result of the lack of any information in the file. The complaint prayed for $4.25 million in damages. Wilner had received a settlement demand from Coleman in the amount of $1 million. Wilner assessed the situation as follows: "At the present time there exists the potential for a runaway verdict in this case. . . . Again, we cannot comment on the validity of these claims." With respect to Berger Kahn's representation, Wilner stated: "I believe that the conduct of your previous counsel is indefensible and the Plan defendants' position in this matter is entirely the result of their malpractice. We are severely hampered in our ability to even evaluate this case by the lack of pretrial preparation. The Plan defendants' defense has been severely prejudiced." As a result, Gulf was forced to settle the *Coleman* Action for the settlement offer (less the $100,000 deductible and the limits that remained on Singer's policy). In its representation of Signature, Berger Kahn billed a total of $14,000 for legal fees in the *Coleman* Action.

With respect to whether there was a triable issue as to whether the Berger Kahn defendants caused Gulf any damages, the motion for summary judgment was based solely on one interrogatory response by Gulf (interrogatory No. 3, in first set). That interrogatory stated: "Identify with specificity all items of damages that you contend that Thomas Coleman sustained as a proximate cause of any conduct attributable to Nathan Singer." Gulf's response provided in part: "The Plan defendants would have been able to obtain a defense verdict in Coleman v. Singer (thereby benefiting Gulf), hence sustaining no damages as a result of any conduct attributable to Nathan Singer, or the Plan defendants would have been able to obtain a settlement of Coleman v. Singer which was more favorable than the settlement obtained (again, thereby benefiting Gulf), and, again, sustaining less damage as a result of any conduct attributable to Nathan Singer, had Berger Kahn and Gladstone done their job in preparing a defense for the Plan defendants in Coleman v. Singer. Had Berger Kahn and Gladstone not been negligent and/or breached their contract, Thomas Coleman would not have recovered any damages as a proximate cause of any conduct attributable to Nathan Singer or the Plan defendants would have been able to obtain a more

favorable settlement than that which was obtained. [¶] . . . [¶] Had Berger Kahn and Gladstone conducted the necessary investigation, legal research, discovery, and trial preparations, in a timely manner; Singer would not have sustained any damages as a proximate cause of any conduct attributable to Nathan Singer or <u>Coleman v. Singer</u> could have been settled on more favorable terms, for at least the following reasons: [¶] Discovery would have uncovered Coleman's motivations for filing the bankruptcy at the time it was filed, June 1, 1992, including the fact that it was prudent for Coleman to have the bankruptcy filed then, even if it meant that certain of his debts would not be discharged. Coleman did not provide Singer with adequate information to allow Singer to provide Coleman with all pertinent information as to the ramifications of a bankruptcy filing as of June 1, 1992, thereby interfering with Singer's ability to provide full legal advice to Coleman regarding the implications of a bankruptcy filing. Singer could have been educated regarding the fact that he did not indeed breach the standard of care, thereby increasing his credibility with the jury. Coleman could have been impeached as to his veracity, business acumen, motivation, and sophistication, thereby damaging his credibility with the jury. . . . Had Berger Kahn and Gladstone not acted negligently and breached their contract, evidence could have been gathered to present to the jury showing that the Plan defendants were not liable to Coleman for breach of contract, negligence, negligent misrepresentation, and/or breach of contract by a third party beneficiary. . . ." In rebuttal, Gulf offered the memorandum of Michel indicating that the decision of *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858 [110 Cal.Rptr. 511] would be favorable to the defense of the Plan defendants and the statements of Wilner that his firm could not prepare an adequate defense or offer any opinion as to the Plan defendants' exposure because of Berger Kahn's failure to conduct any discovery. Wilner also stated that there were credible legal defenses to the *Coleman* Action, which could not then be raised by summary judgment.

D. *The Trial Court's Ruling on the Summary Judgment Motion*

The trial court granted summary judgment. It ruled that Gulf had no standing to sue the Berger Kahn defendants on either of its causes of action, on the authority of *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229 [45 Cal.Rptr.2d 565] (*Unigard*) and *American Casualty Co. v. O'Flaherty* (1997) 57 Cal.App.4th 1070 [67 Cal.Rptr.2d 539], because its reservations of rights created a conflict of interest. The trial court also concluded that there was no triable issue of fact presented as to whether the Berger Kahn defendants caused Gulf any harm.

### E.  *Post-summary-judgment Proceedings*

The summary judgment was entered on November 9, 1998. Notice of the entry of the judgment was filed on November 13, 1998. (The record does not indicate when, or if, it was served.) On December 24, 1998, Gulf filed its notice of appeal.

## STANDARD OF REVIEW

██  The trial court's ruling on a motion for summary judgment is subject to de novo review. (*Ruoff v. Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627 [13 Cal.Rptr.2d 755].) In conducting this review, the applicable principles are that the "motion for summary judgment shall be granted if all of the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the " 'action has no merit or that there is no defense' thereto. (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment meets this burden by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2) . . . .) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of *material* fact exists as to that cause of action or defense." (*Barton v. Elexsys Internat., Inc.* (1998) 62 Cal.App.4th 1182, 1187 [73 Cal.Rptr.2d 212], original italics.)

## DISCUSSION

Two issues are presented here for review. The first is whether Gulf has standing to pursue its claims and the second is whether there is a triable issue of fact as to whether the Berger Kahn defendants caused Gulf any injury. We consider each of these issues in order.

## STANDING

### A.  *Did an Attorney-client Relationship Exist Between Gulf and Berger Kahn?*

██  The Berger Kahn defendants contend that Gulf lacks standing to sue them because the Plan defendants, not Gulf, first hired them. They argue that since the Plan defendants had a preexisting relationship with them, first contacted them about the *Coleman* Action, first retained their services, were

the only ones to pay their legal fees, and provided them with the file related to the *Coleman* Action before they even tendered that matter to Gulf, the Berger Kahn defendants were their attorneys, not Gulf's.

This argument is fatally flawed, resting as it does on the implicit assumption that as between the insurer and the insured, only one can establish an attorney-client relationship with the insured's defense attorney, and that that relationship is established only by the first to contact that counsel. This belies the tripartite relationship that exists between the insurer, the insured and counsel defending the insured. (See *Bogard v. Employers Casualty Co.* (1985) 164 Cal.App.3d 602, 609 [210 Cal.Rptr. 578] ["The attorney hired by the insurance company to defend in an action against the insured owes fiduciary duties to two clients: the insurer and the insured."].) Properly characterized, the issue presented is not who initially selected and retained the defense attorney but with whom the attorney-client relationship was established.

■ In determining whether an attorney-client relationship has been established, several guiding principles are applicable. "It is elementary that the *relationship* between a client and his retained (or noncourt-appointed) counsel arises from a contract, whether written or oral, implied or expressed." (*Purdy v. Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 75 [203 Cal.Rptr. 524], original italics.) An attorney-client relationship can be formed though no retainer is signed or no fees are paid. (*Miller v. Metzinger* (1979) 91 Cal.App.3d 31, 39-40 [154 Cal.Rptr. 22].) Quoting from *Perkins v. West Coast Lumber Co.* (1900) 129 Cal. 427, 429 [62 P. 57], *Miller v. Metzinger, supra,* 91 Cal.App.3d at page 39 stated: " 'When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established prima facie.' The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising." (Italics omitted.) Contractual formality is not required. (91 Cal.App.3d at p. 40.)

■ Properly analyzed, it is clear that the Berger Kahn defendants were counsel for both the Plan defendants and Gulf. Although the Plan defendants first contacted and retained Berger Kahn with regard to the *Coleman* Action, they clearly did so with the understanding that they had to select counsel acceptable to Gulf. Nothing in the facts presented suggests that the Plan defendants believed that they could have, or would have, insisted on the use of that firm over Gulf's objection. Their tender to Gulf, advising of their selection of Berger Kahn, reflected their sensitivity to Gulf's interests, by their statement that "[w]e understand that they [Berger Kahn] were recently added to your list of 'Approved Counsel.' " Gulf also understood that

selection of counsel for its insureds was its prerogative as Media Profession-al's correspondence asserted Gulf's right to give approval and condition that approval on Berger Kahn's adherence to Gulf's defense guidelines. Gulf required the Berger Kahn defendants to provide it with a budget for the defense of the *Coleman* Action and a report of the exposure, settlement posture and needed discovery and research and related matters, all confiden-tial attorney-client or work product information to which Gulf would not have been entitled absent an attorney-client relationship with Berger Kahn. Berger Kahn signed the defense guidelines, reflecting its agreement to those terms, even negotiating an increase in the hourly rates at which it would be compensated.

The signed defense guidelines, with the negotiated hourly rate, and sub-sequent correspondence, along with the subsequent dealings between the Berger Kahn defendants and Gulf, reflected an agreement between them and an attorney-client relationship as a matter of law.

We find no significance that the defense guidelines were signed by Goldstone under a signature block for MWE, rather than Berger Kahn. The record contains no explanation for signing in this fashion and the terms of that document, the subsequent correspondence and the conduct of Berger Kahn evidence its belief that it was party to that agreement.

Nothing in the record suggests that Berger Kahn was retained as indepen-dent *Cumis* counsel for the Plan defendants; there was no demand therefor, no claims of conflict of interest (until long after the fact), nor would *Cumis* counsel have been obligated to share work product information with Gulf. Berger Kahn was retained as counsel approved by Gulf to represent its insured. Counsel retained by an insurer to defend its insured has an attorney-client relationship with the insurer. *(Kirtland & Packard v. Superior Court* (1976) 59 Cal.App.3d 140, 145 [131 Cal.Rptr. 418]; *American Mut. Liab. Ins. Co. v. Superior Court* (1974) 38 Cal.App.3d 579, 590-591 [113 Cal.Rptr. 561]; *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg* (1994) 30 Cal.App.4th 1373, 1385 [36 Cal.Rptr.2d 424] [recognized in dictum that the insurer could have asserted a legal malpractice claim as employer and client of the insured's defense attorney].)

B. *Can Gulf Prosecute Claims Against Berger Kahn Related to Berger Kahn's Legal Malpractice in Representing Gulf's Insured?*

▇ Having established an attorney-client relationship between Gulf and the Berger Kahn defendants, it must be determined whether under applicable law Gulf can sue them for alleged malpractice committed in representing the Plan defendants.

In *Fifield Manor v. Finston* (1960) 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813], because of the highly personal nature of malpractice actions, the Supreme Court held that legal malpractice claims are not assignable. *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra,* 30 Cal.App.4th 1373, 1385, rejected equitable subrogation as a basis for an insurer's legal malpractice action against an attorney hired by it to defend its insured, concluding that equitable subrogation was sufficiently similar to assignment so as to be controlled by *Fifield Manor.* However, in dictum, the court suggested that insurers could assert a direct right of action (not by subrogation) for malpractice as the employer and client of the defense attorney. *(Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra,* 30 Cal.App.4th at p. 1385.)

*Unigard, supra,* 38 Cal.App.4th 1229, was the first California case to deal squarely with the dictum in *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra,* 30 Cal.App.4th 1373. In *Unigard,* the plaintiff was not asserting a right to sue for malpractice of the counsel it hired for its insured based upon equitable subrogation, but upon "an independent right to assert a malpractice claim against the O'Flaherty law firm arising out of its allegedly negligent representation . . . ." of the insured. (*Unigard, supra,* 38 Cal.App.4th at p. 1235.) The court held that when, pursuant to insurance company obligations, an insurer hired counsel to defend its insured, the retained attorney owes a duty of care to the insurer that will support its independent right to bring a legal malpractice action for acts committed in the representation of the insured, provided the interests of the insurer and insured are not in conflict. (See also *American Casualty Co. v. O'Flaherty, supra,* 57 Cal.App.4th 1070.)

*Unigard* found the rationale for its conclusion in the out-of-state case, *Atlanta Intern. Ins. Co. v. Bell* (1991) 438 Mich. 512 [475 N.W.2d 294],[3] which it quoted, at length, as follows: " 'A rule of law expanding the parameters of the attorney-client relationship in the defense counsel-insurer context might well detract from the attorney's duty of loyalty to the client in a potentially conflict-ridden setting. Yet to completely absolve a negligent defense counsel from malpractice liability would not rationally advance the attorney-client relationship. Moreover, defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer. The only winner produced by an analysis precluding liability would be the malpracticing attorney. . . . [¶] The defense counsel-insurer relationship is unique. The insurer typically hires, pays, and consults with defense

[3]*Atlantic Intern. Ins. Co.* was based upon the doctrine of equitable subrogation, rejected in California. *Unigard* found its rationale, nonetheless, equally applicable to direct actions by insurers against counsel selected to represent their insureds. (*Unigard, supra,* 38 Cal.App.4th at pp. 1235-1236.)

counsel. The possibility of conflict unquestionably runs against the insured, considering that defense counsel and the insurer frequently have a longstanding, if not collegial, relationship. [¶] In a malpractice action against a defense counsel, however, the interests of the insurer and the insured generally merge. The client and the insurer both have an interest in not having the case dismissed because of attorney malpractice. Allowing recovery for the insurer on the basis of the failure of defense counsel to adhere to basic norms of duty of care thus would not 'substantially impair an attorney's ability to make decisions that require a choice between the best interests of the insurer and the best interests of the insured.' . . . The best interest of both insurer and insured converge in expectations of competent representation.' " (*Unigard, supra,* 38 Cal.App.4th at p. 1236.) The *Unigard* court continued: "We conclude that where the insurer hires counsel to defend its insured *and* does not raise or reserve any coverage dispute, and where there is otherwise no actual or apparent conflict of interest between the insurer and the insured that would preclude an attorney from representing *both,* the attorney has a dual attorney-client relationship with both insurer and insured." (*Id.* at pp. 1236-1237, some original italics omitted.)

Thus, Gulf had the right to sue the Berger Kahn defendants for malpractice so long as there existed no conflict of interest in Berger Kahn's dual representation of Gulf and the Plan defendants in the *Coleman* Action.

### C. *Did Berger Kahn Have a Conflict of Interest in Representing Both Gulf and the Plan Defendants?*

In an effort to demonstrate that there was a conflict of interest precluding Gulf from suing them, the Berger Kahn defendants point to the numerous times that Gulf asserted reservations of rights in connection with defense of the *Coleman* Action. When Gulf first acknowledged that the negligence and negligent misrepresentation causes of action "certainly would be covered with regard to indemnity obligations under the policies," it denied coverage "for or arising out of breach of contract . . . ." It also indicated that under the excess policy, certain claims occurring before the retroactive date were not covered. Gulf nevertheless agreed to defend the entire action with a broad reservation of all of its rights under the insurance policy. The Plan defendants responded to these reservations, stating that they did not choose to disagree with them at that time. On numerous subsequent occasions, Gulf reiterated its reservations. In ruling on the summary judgment motion, the trial court also found "that there was an actual and apparent conflict of interest . . . ," considering "Plaintiff's multiple reservation of rights immediately placed defendants in a position where, if they owed a duty of care to

plaintiff, they would potentially have to harm one 'client' to serve another." Both the trial court and the Berger Kahn defendants perceived that the assertion of a reservation of rights ipso facto created a conflict of interest precluding Gulf from suing the Berger Kahn defendants for malpractice.

■ However, "not every reservation of rights creates a conflict of interest requiring appointment of independent counsel." *(Blanchard v. State Farm Fire & Casualty Co.* (1991) 2 Cal.App.4th 345, 350 [2 Cal.Rptr.2d 884]; *Foremost Ins. Co. v. Wilks* (1988) 206 Cal.App.3d 251, 260 [253 Cal.Rptr. 596].) "A mere possibility of an unspecified conflict does not require independent counsel. The conflict must be significant, not merely theoretical, actual, not merely potential." *(Dynamic Concepts, Inc. v. Truck Ins. Exchange* (1998) 61 Cal.App.4th 999, 1007 [71 Cal.Rptr.2d 882]; see also *Lehto v. Allstate Ins. Co.* (1994) 31 Cal.App.4th 60, 71 [36 Cal.Rptr.2d 814].)

In the *Dynamic Concepts, Inc.,* case, the issue was "whether an insurer in an action involving covered and uncovered claims is automatically obliged to provide independent counsel pursuant to Civil Code section 2860, subdivision (b)." *(Dynamic Concepts, Inc. v. Truck Ins. Exchange, supra,* 61 Cal.App.4th at p. 1006.)[4] The insured under a comprehensive general liability policy was sued for breach of contract, fraud, interference with prospective economic advantage, RICO (Racketeer Influenced and Corrupt Organizations Act) and declaratory relief, as well as for conversion. There was a final cause of action for trade libel. Truck Insurance Exchange accepted the tender of defense, invoked by the libel claim, under a reservation of rights since none of the other claims was covered under the policy. In rejecting a per se rule requiring appointment of independent counsel whenever there is a "global reservation of rights" *(Dynamic Concepts,* at p. 1007), *Dynamic Concepts* stated that "[n]o reason exists to allow insureds who face the prospect of no defense or indemnity for uncovered claims to 'set up' insurers by making *Cumis* demands with unreasonably short deadlines, especially where the issues listed in the underlying litigation do not coincide with the issues raised in the reservation of rights and where the insurer agrees to provide a full and complete defense without regard to coverage. [¶] An insurer's reservation of rights may create a disqualifying conflict of interest requiring the insurer to pay the cost of *Cumis* counsel to represent the insured in the underlying action. [Citation.] But not every reservation of rights entitles an insured to select *Cumis* counsel. There is no such entitlement, for example, where the coverage issue is independent of, or extrinsic

---

[4]Civil Code section 2860 is the *Cumis* counsel statute, which provides for the circumstances wherein a conflict of interest requires an insurer to provide its insured with independent counsel.

to, the issues in the underlying action [citations]." (*Id.* at p. 1006.) The court found that "[t]he supposed *Cumis* conflict for the covered libel claim was vague, ephemeral and highly theoretical." (*Id.* at pp. 1009-1010.)

There is no talismanic rule that allows a facile determination of whether a disqualifying conflict of interest exists. Instead, "[t]he potential for conflict requires a careful analysis of the parties' respective interests to determine whether they can be reconciled . . . or whether an actual conflict of interest precludes insurer-appointed defense counsel from presenting a quality defense for the insured." *(Dynamic Concepts, Inc. v. Truck Ins. Exchange, supra,* 61 Cal.App.4th at pp. 1007-1008.) "[I]nsurer appointed defense counsel may obviate any *potential* conflict involving uncovered claims by ' "proceed[ing] diligently to litigate the matters that he was charged with on behalf of his client [the insured]." ' " (*Id.* at p. 1008, original italics.)

In *Native Sun Investment Group v. Ticor Title Ins. Co.* (1987) 189 Cal.App.3d 1265 [235 Cal.Rptr. 34], the state asserted claims against the plaintiff's property, some of which the insurer conceded were covered and some of which it denied. In finding no conflict requiring appointment of *Cumis* counsel because there was no limitation placed by the insurer on the litigation of any of the claims, covered or uncovered, and counsel showed no preference in his defense of the suit, the court noted that a key to determining whether a disqualifying conflict exists is whether "the retained attorney *in fact* was . . . subject to the conflicting forces which gave rise to *Cumis* . . . ." (*Id.* at pp. 1277-1278, italics added.)

A disqualifying conflict exists if "[I]nsurance counsel had . . . incentive to attach liability to [the insured]." (*Blanchard v. State Farm Fire & Casualty Co., supra,* 2 Cal.App.4th at p. 350.) "The test is whether the conflict 'precludes the insurer-appointed defense counsel from presenting a quality defense for the insured.' " (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 7:772.)

▮ We conclude that Berger Kahn defendants had no conflict that would preclude Gulf from suing them for their malpractice. Gulf undertook defense of the entire action without specifically reserving any right to seek reimbursement for the defense costs of the uncovered claims. The reservations of rights asserted by Gulf were largely general in nature and for the purpose of protecting against unknown eventualities which might subsequently arise. The only specific reservation was that Gulf's policy did not afford coverage for the contract claims while providing coverage for the negligence and negligent misrepresentation claims. However, this reservation created no disqualifying conflict.

Nothing in the facts presented suggests that the Berger Kahn defendants had the ability to transfer liability from the covered claims to the uncovered ones. Essentially the same factual charges formed the basis of the covered negligent misrepresentation claim and the uncovered contract claim. Both were based upon contentions that the Plan defendants failed to provide the promised quality of legal services. Thus, the Berger Kahn defendants could not act for Gulf's benefit to the Plan defendants' detriment by transferring liability from covered to uncovered claims by presenting different facts.

Moreover, that the Plan defendants had an existing relationship with the Berger Kahn defendants and initially contacted and retained them before tendering the matter to Gulf further mitigates against the concerns that give rise to the need for independent counsel for an insured. As stated by *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358, 364, footnote 3 [208 Cal.Rptr. 494, 50 A.L.R.4th 913],[5] in discussing the conflict faced by counsel in the triangular representation afforded the insured by the insurer's lawyers, " '[a]s a practical matter, however, there has been recognition that, in reality, the insurer's attorneys may have closer ties with the insurer and a more compelling interest in protecting the insurer's position, whether or not it coincides with what is best for the insured.' " This concern is mitigated here, where the Plan defendants for several years had had an independent relationship with the Berger Kahn defendants.

It must also be considered that attorneys are under an ethical stricture to avoid conflicts of interest. Rules of Professional Conduct, rule 3-310 (C)(1) provides that "A member shall not, without the informed written consent of each client: [¶] (1) accept representation of more than one client in a matter in which the interests of the clients potentially conflict. . . ." As stated in *San Diego Federal Credit Union v. Cumis Ins. Society, Inc., supra,* 162 Cal.App.3d at page 375: "We conclude the Canons of Ethics impose upon lawyers hired by the insurer an obligation to explain to the insured and the insurer the full implications of joint representation in situations where the insurer has reserved its rights to deny coverage. If the insured does not give an informed consent to continued representation, counsel must cease to represent both." Thus, if a conflict of interest existed in Berger Kahn's dual representation, it had an independent ethical obligation to disclose the conflict to Gulf and the Plan defendants and either obtain written waivers of the conflict or withdraw. The Berger Kahn defendants have failed to point to any evidence in the record that it recognized any conflict or brought any conflict to the attention of either of its clients. It is thus anomalous for the

---

[5] *Cumis* has been superseded by Civil Code section 2860.

Berger Kahn defendants to now urge, in order to escape the malpractice action by Gulf, that they had a disqualifying conflict of interest in their dual representation of Gulf and the Plan defendants which they were under an ethical duty at the time of the representation to divulge, and they did not.

In light of the foregoing, we conclude that there existed no disqualifying conflict of interest that prevents Gulf from suing the Berger Kahn defendants.

## CAUSATION

A second ground for the Berger Kahn defendants' motion for summary judgment was that Gulf could not establish that the Berger Kahn defendants' alleged negligence caused it any injury. Gulf challenges this contention on two grounds. First, Gulf asserts that under the summary judgment statute, the Berger Kahn defendants, as the moving parties, had the initial burden of establishing a lack of evidence of causation in order to shift the burden to Gulf to present a triable issue of fact on that point. Gulf claims that the Berger Kahn defendants failed to meet this initial burden. Second, Gulf argues that even if the Berger Kahn defendants' evidence on causation was sufficient to shift the burden, Gulf met its burden and presented sufficient facts to create the necessary triable issue. Since we agree with Gulf's first contention, we need not deal with its second.

In order to prevail on a summary judgment motion, a defendant must show that "one or more elements of the cause of action . . . cannot be established. . . . Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (o)(2).)

In *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653], this court discussed the kind of evidence required under Code of Civil Procedure section 437c, subdivision (o)(2) in order to shift the burden from a defendant moving for summary judgment to the plaintiff. After extensive analysis of the legislative history of the 1992 and 1993 amendments to that code section, the court concluded that those amendments overruled prior cases which required defendants moving for summary judgment to *disprove* an element in the plaintiff's cause of action, rather than simply showing that there was no evidence to support it. After those

amendments, a moving defendant could rely on the plaintiff's "factually devoid discovery responses" to shift the burden. (*Union Bank v. Superior Court, supra,* 31 Cal.App.4th at p. 590.) The court relied upon plaintiff's responses to requests for admissions and form interrogatories, which squarely and unambiguously sought all of the facts related to the challenged element in the plaintiff's case, concluding that they contained no facts supporting the existence of misrepresentations or fraudulent conspiracy, allegations essential to plaintiff's claim against the defendant. The "factually devoid discovery responses" (*ibid.*) were therefore sufficient to shift the burden.

The recent decision in *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64 [81 Cal.Rptr.2d 360], relied upon by Gulf, considered the issue of what discovery could be considered "factually devoid." The defendant, Dinwiddie, was sued based upon its alleged liability for asbestos exposure to the plaintiff. Dinwiddie moved for summary judgment on the grounds that there was no evidence to suggest its presence at work sites where the plaintiff's exposure to asbestos allegedly occurred. The *Dinwiddie* court discussed the *Union Bank* case in detail, adopting its conclusion that factually devoid discovery, presented by the defendant, which reflected that the plaintiff lacked any significant evidence on an element of its cause of action, would shift the burden of proof to the plaintiff. (*Sheiding v. Dinwiddie Construction Co., supra,* at p. 83.) However, *Dinwiddie* distinguished *Union Bank* because the discovery in *Dinwiddie,* unlike *Union Bank,* failed to reveal any facts relevant to Dinwiddie's presence because it was not directed at that issue. Thus, it could not be inferred from the discovery responses that there was no evidence on the disputed issue. The court stated that "there is nothing in this record to suggest his answers were complete as to Dinwiddie. To put it another way, the duty to answer completely only extended so far as the reasonable ambit of the questions which were asked." (*Id.* at p. 80.) In other words, to grant summary judgment, the court must be able to infer from the record that the plaintiff could produce no other evidence on the disputed point.

■ As instructed by *Dinwiddie,* we must evaluate the discovery proffered by the Berger Kahn defendants to determine whether it is reasonable to infer that Gulf can produce no evidence of causation. Such an evaluation reveals that Berger Kahn's proffered discovery does not permit this conclusion, and therefore did not shift the burden to Gulf to refute the causation claim.

The only evidence presented by the Berger Kahn defendants in an effort to meet its initial burden on the causation issue was Gulf's answer to one

interrogatory which asked Gulf to identify "all items of damages that you contend that *Thomas Coleman sustained as a proximate cause of any conduct attributable to Nathan Singer.*" (Italics added.) The interrogatory did not inquire as to damages suffered by Gulf as a result of the Berger Kahn defendants' alleged malpractice.

Gulf's answer to this interrogatory was nonresponsive. It did not specify the damages Coleman suffered as a result of Singer's negligence but rather stated that but for the Berger Kahn's negligence the Plan defendants would have received a defense verdict or a more favorable settlement. Assuming this response constituted factually devoid discovery shifting the burden if given in response to an interrogatory that called for Gulf's damages caused by Berger Kahn, we cannot reach that conclusion here where Gulf provided a nonresponsive answer to a different interrogatory that called for Coleman's damages caused by Singer. We cannot opine on what response Gulf might have given to an interrogatory asking Gulf to state all damages which it suffered as a result of the Berger Kahn defendants' negligence.

Were there a direct correlation between the damages requested in the proffered interrogatory, those suffered by Coleman at the hands of Singer, and the damages suffered by Gulf as a result of the alleged negligence of the Berger Kahn defendants, then the absence of any responsive information might permit the conclusion that Coleman suffered no damages and thus Gulf also suffered no damages as a result of the Berger Kahn defendants' alleged negligence. However, the correlation between the damages suffered by Coleman at the hands of Singer is inverse to those suffered by Gulf as a result of the Berger Kahn defendants' actions. If Singer caused Coleman no damages, then Gulf suffered substantial damages as a result of having to settle the *Coleman* Action for in excess of $800,000. Conversely, if Coleman suffered substantial damages at Singer's hands, then Gulf's settlement payment reflected less, if any, damages to it. Thus, if we draw the inference that Gulf's failure to provide any facts showing damages to Coleman in the interrogatory response, connotes that there were no such damages, then Gulf's large settlement payment was caused by the negligence of the Berger Kahn defendants. In any event, it certainly does not permit the conclusion that Gulf suffered no damages caused by the Berger Kahn defendants.

We thus conclude that the discovery proffered by the Berger Kahn defendants did not constitute factually devoid discovery to shift the burden to Gulf on the question of causation of Gulf's damages, since it did not call

for information on that subject (or for other information from which information on that subject could be deduced). Moreover, to the extent that nonresponsive information was provided which might have born on the question of causation, since it was not called for by the interrogatory, it would be speculation to determine what response would have been provided to a question squarely asking about Gulf's damages. We cannot assume that all information was provided to an interrogatory that was not propounded.

Where attorneys have failed to diligently represent their clients, thereby placing them in the position that an unfavorable settlement is necessary, the proof of damages is always a difficult one. But that alone should not prevent a party injured by an attorney's malpractice from having his day in court. (See *Benard v. Walkup* (1969) 272 Cal.App.2d 595, 606 [77 Cal.Rptr. 544] ["[T]he applicable rule is that which states that one whose wrongful conduct has rendered difficult the ascertainment of damages cannot complain because the court must make an estimate of damages rather than an actual computation."].)

Having reached this conclusion, we need not determine whether Gulf created a triable issue of fact had the burden shifted to it.

## DISPOSITION

The summary judgment is reversed, costs on appeal awarded to Gulf and the matter remanded to the trial court.

Boren, P. J., and Nott, J., concurred.

On March 17, 2000, the opinion was modifed to read as printed above. Respondents' petition for review by the Supreme Court was denied May 17, 2000.